**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Dennis SWINGLER, Jack E. Houser, Jr., Ralph W. Vicory, James D. Jahnke, Jerald W. Richardson, Larry Lee Richardson, Defendants-Appellants.**

Nos. 83–1570, 83–1571, 83–1572, 83–1590, 83–1598 and 83–2434.

United States Court of Appeals,
Tenth Circuit.

March 20, 1985.

Patrick T. Murphy, Asst. U.S. Atty., Denver, Colo. (Robert N. Miller, U.S. Atty., and John O. Martin, Asst. U.S. Atty., Denver, Colo., with him on brief), for United States of America, plaintiff-appellee.

Jack S. Nordby, Minneapolis, Minn. (Alan P. Caplan, San Francisco, Cal., with him on brief), for Dennis Swingler, Ralph W. Vicory, James D. Jahnke and Larry Lee Richardson, defendants-appellants.

Rollie R. Rogers, Denver, Colo. (William Sublette, Denver, Colo., with him on brief), for Jack E. Houser, defendant-appellant.

Vicki Mandell-King, Asst. Federal Public Defender, Denver, Colo. (Michael G. Katz, Federal Public Defender, Denver, Colo., with her on brief), for Jerald W. Richardson, defendant-appellant.

Before BARRETT, Circuit Judge, DOYLE, Circuit Judge, and BOHANON, Senior District Judge.*

BOHANON, Senior District Judge.

These cases are appeals from convictions under several counts of an indictment alleging conspiracy to distribute d. 1. amphetamine, a federally controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 846 (Count I); conspiracy to manufacture d. 1. amphetamine in violation of the same statutes (Count II); and travel in interstate commerce to facilitate the promotion, establishment and carrying on of an unlawful activity in violation of 18 U.S.C. §§ 2 and 1952 (Count IV). The jury found defendants Jack Houser, Jerald Richardson and James Jahnke guilty on Counts I, II and IV, defendant Dennis Raymond Swingler guilty on Counts II and IV, and defendant Ralph Vicory guilty of Counts I and IV. Because defendant Larry Richardson was not apprehended until several months after the other defendants were arrested, he was tried separately. He was found guilty of Counts I, II and IV. The trial court severed Counts V and VI of the Indictment because none of the present defendants were charged in those counts, and dismissed Count III.

## THE FACTS

All of the defendants, except Jerald and Larry Richardson, on appeal challenge the legality of their arrests and subsequent searches of their vehicles. Because one member of the gang, Robert Fisher,[1] became a government witness and revealed much significant information only after those arrests, it will be useful to discuss the facts of these cases in two stages. What follows immediately hereafter is a summary of the evidence the government possessed during the time prior to and including the arrests of Vicory, Jahnke, Houser, Jerald Richardson and Swingler. Additional facts will be introduced as appropriate in connection with our discussion of other issues the defendants raise.

The criminal activity giving rise to these cases involves primarily members of the Colorado chapter of the Sons of Silence motorcycle gang. The members of this gang had a long history of illegal use and distribution of controlled substances and were investigated by the F.B.I., through Special Agent Bradley Timms, commencing in September of 1981. During September of the following year, 1982, Agent Timms made contact with Beth Fisher, the divorced wife of Robert Fisher who was living again with her ex-husband. Agent Timms persuaded her to cooperate in the F.B.I. investigation. Thereafter, Beth Fisher was in contact with Agent Timms on an almost daily basis and relayed to him all that she could learn from her husband about the drug-related activities of the Sons of Silence, particularly with reference to their use and sale of amphetamine.[2] The information she provided was accurate and was never contradicted by information received through other channels including, at one point, electronic listening devices placed in the house Beth shared with Bob and on their telephone.

On January 10, 1983, or thereabouts, Bob Fisher told Beth that Larry Richardson,

* Honorable Luther Bohanon, Northern, Eastern and Western Districts of Oklahoma, sitting by designation.

1. At Judge Doyle's request we have altered the names of certain key government witnesses and law enforcement personnel for the protection of the persons concerned and of other ongoing investigations.

2. Chemistry recognizes significant distinctions between amphetamine and methamphetamine, and each of their salts, optical isomers, and salts of optical isomers. All of these chemicals are controlled substances under 21 U.S.C. § 812, however, and all are commonly referred to by illicit users as "speed" or "crank," etc., without regard to or knowledge of their differences. In addition, though the substance eventually seized in connection with the present cases was subsequently determined to be d. 1. amphetamine, trafficking in "speed" from other sources, of undetermined chemical structure, was also involved during the period covered by the indictment. Accordingly, we feel it would be impractical and unreasonable to demand strict accuracy in the nomenclature applied to the substances involved here and will refer to any and all of them as simply "amphetamine" for the purposes of this opinion.

also known in the gang as "Butch," had asked Bob to make a trip to California to pick up 60 pounds of amphetamine and return with it to Colorado. Bob understood he was to receive two pounds of the amphetamine for himself for doing the favor. In subsequent days Bob learned more details of Richardson's plan which apparently involved more people and was still in the formation stage. Bob told Beth, who without Bob's knowledge was relaying each successive version of the scheme to the F.B.I.

Finally, on January 17, 1983, the conspirators, including Bob and the defendants in this case, except Jack Houser, finalized their plans at a meeting during a party in Longmont, Colorado. As Agent Timms eventually learned of these plans through Beth, it appeared that five couriers had been selected to go to California to pick up equal portions of the drug, that is, twelve pounds each. These couriers were to be Bob Fisher, Arnie, last name unknown, Ralph Vicory, Jimmy, last name unknown, and Ben Reed. Beth also indicated that Carl Elsner and a gang member she knew only as "Oarless" were to rent a truck in California and transport a complete laboratory, including chemicals, for the manufacture of amphetamine back to Denver where a "chemist" or "cook" would also be brought to operate the lab. The couriers involved in the scheme would receive in payment two pounds each of the amphetamine they transported as well as a portion of every batch subsequently produced by the laboratory.

In the early evening of Friday, January 21, Beth talked with Agent Timms and told him that Ben Reed had come by the motel room she and Bob were then occupying to obtain two grams of amphetamine for Ralph Vicory and Ben to use on their trip. At that time Reed indicated to her that he thought the best route to California and back would be through Wyoming on Interstate 80.

Early on Saturday morning, January 22, 1983, Beth Fisher again contacted Agent Timms and told him that Bob had obtained a rental car and that they would shortly be leaving for California. She gave Agent Timms the description of the car and license plate number and also a phone number with a California area code that Bob had given her the night before. She said Bob had written the number on a piece of paper with the word "Stockton" and had said with considerable elation that this was the number that was going to make them rich, that it was the contact number in California.

Over the next several days, Agent Timms traced this number with the aid of the F.B.I. division office in Sacramento, California. He learned that the number was assigned to 1219 Dakota Avenue in Modesto, California, and that this address was known to the local sheriff's office as the residence of Cecelia Martinez and Glen Gary who was president of the Barhoppers motorcycle gang and known to be heavily involved in the manufacture and distribution of amphetamine. He further learned that Glen Gary was currently incarcerated on a murder conviction but that his drug business was still being operated by Cecelia Martinez and an individual named Jack Houser who was known through informants to have been trained by Glen Gary as a "chemist" or "cook" capable of manufacturing amphetamine.

During the same conversation in which he obtained the Modesto phone number, Agent Timms pressed Beth for more identifying information about "Arnie" and "Jimmy," the two couriers whose last names she did not know. She could not tell him anything more about Arnie, but said Jimmy was a member of the Sons of Silence from Minnesota and drove an older mid-60's model large size 4-door blue Oldsmobile.

On Sunday, January 23, Agent Timms contacted Denver Police Detective Don Simpson who had been investigating motorcycle gangs in Colorado for five years and was on more or less familiar terms with the Sons of Silence. Detective Simpson was immediately able to identify the gang member Beth Fisher had called "Oarless" as being in fact Dennis Ray Swingler. Later

the same evening, Detective Simpson was again called and requested to find out who "Jimmy" was. The following morning Simpson called Joy Rikala of the Minnesota Bureau of Criminal Apprehension with whom he had exchanged information about motorcycle gangs in the past. Given the information about Jimmy that the F.B.I. had at that point, that is, that he was a member of the Sons of Silence in Minnesota who drove a blue mid-60's year Oldsmobile, Rikala was able to identify him as James Dean Jahnke and conveyed this information to Detective Simpson along with Jahnke's date of birth and the Minnesota license plate number for his 1965 Oldsmobile.

In the meantime the Fishers had left for California tailed by an eight-person surveillance team, arriving in Stockton, California, sometime during the morning of Sunday, January 23. During the trip, contact was maintained with Beth by F.B.I. Special Agent Marabel Hawkins who met Beth in bathrooms at stops along the way.

The Fisher's car was followed to Stockton arriving on Sunday morning, January 23, 1983. Bob made a phone call at a grocery in Stockton, then they drove to a gas station in Ripon, approximately 10 to 15 miles from Modesto, where the couple stopped to get gasoline. At that time Beth made a short phone call to the F.B.I. informing them that Bob had made contact and obtained an address on Dakota Street in Modesto where they were then heading. The Fishers were subsequently followed to 1219 Dakota Avenue in a rural area of Modesto, California, the same address Agent Timms had previously determined to correspond to the telephone number Bob gave Beth on Friday night in Denver. Bob got out of the car and went into the house but returned shortly, and they drove off. In all, the Fisher vehicle was at the house on Dakota Avenue for approximately 15 minutes. Several other vehicles were observed to be parked at that house both before and after the Fisher visit, including an older model Mercury Cougar.

After leaving the house on Dakota Avenue, the Fishers drove to a restaurant in Modesto where they ate. While there, Beth met Agent Hawkins in the ladies restroom and told her what had happened at the 1219 Dakota address. She said that when they pulled up to the house Carl Elsner, another member of the Colorado Sons of Silence, was in the garage. Bob walked into the garage and talked with Elsner for a few minutes, then got back into the car extremely upset about the conversation. Bob told Lynn that Elsner had said Bob was too late and that his 12 pounds of amphetamine had been taken by Jimmy (Jahnke). Bob was afraid that he wouldn't get the two pounds of amphetamine he was promised for making the trip. Beth also told Agent Hawkins that Bob thought the laboratory equipment was to be loaded into a U-Haul truck sometime after the Fulmers left the house.

After eating at the restaurant, the Fishers began their return trip to Colorado, intending to spend the night in Reno, Nevada. Again they were followed by a surveillance vehicle but on the road up to Donner Pass this vehicle broke down. Sometime thereafter the Fishers, now out of surveillance, overtook a U-Haul truck on the Donner Pass road and recognized its driver to be "Oarless," that is, the defendant Dennis Swingler. Bob got Swingler to pull over and stop and then got out of his car to talk to Swingler. When he returned, Bob told Beth that Swingler had the laboratory, that Swingler didn't think Bob would lose his share of the proceeds of the trip, and that Bob and Swingler were going to meet in Reno. Thereafter the Fishers went ahead of the U-Haul which was traveling very slowly up the pass and on into Reno.

After they checked into their hotel room and Bob left to find Swingler, Beth telephoned Agent Timms. She told him about meeting Swingler on Donner Pass and described the U-Haul truck he was driving. Agent Timms in turn informed Beth that the surveillance unit following her had broken down but that some F.B.I. agents would be flying into Reno in the morning. The next day, January 24, the agents did

arrive and, without Bob's knowledge, took Beth into protective custody at about 4:00 in the afternoon.

Also on Sunday evening, January 23, Agent Timms, who was coordinating the multi-state surveillance effort involving, at times, up to 50 F.B.I. agents and local law enforcement personnel, received a phone call from Supervisor Samuel Garth of the Sacramento, California, F.B.I. office who was then calling from a pay phone on the side of interstate 80 in the Donner Pass vicinity. Agent Garth had been part of a surveillance team that had watched the house on Dakota Avenue in Modesto during the afternoon after the Fishers made their brief visit. He reported that he had seen a brown Mercury Cougar at the residence which a license plate check showed to be registered to Jack Houser of that address. One unidentified white male had been seen carrying items and putting them in the trunk of the car and was observed to be acting suspiciously, in the sense of checking the surroundings for onlookers and taking precautions to prevent the items he was loading into the trunk from being seen. In the late afternoon two men from the house got into the car and drove off. They were followed to the vicinity of Auburn, California, where the car was stopped by a California highway patrolman on a traffic citation. Agent Garth learned through the highway patrolman that the driver had furnished the driver's license of Jack Houser, but that the passenger had not been identified. When Agent Garth phoned Agent Timms, the Cougar was headed east on I–80 toward Donner Pass following the same route earlier taken by the Fishers. Agent Timms also learned Sunday evening that F.B.I. surveillance teams had been unable to locate Ralph Vicory's Chevrolet Monte Carlo at his residence in Greeley, Colorado. On the basis of this information and the knowledge he possessed after the above-described calls on Sunday evening, Agent Timms caused an all-points bulletin to be teletyped to law enforcement agencies in Colorado, Wyoming, Nevada and Utah. The bulletin advised that four members of the Sons of Silence motorcycle gang were en route from northern California to Denver via Interstate 80 with a major amphetamine shipment. Among other information, the bulletin indicated that Ralph Vicory was driving a maroon over silver older Monte Carlo. He requested that if the subjects were spotted they should be detained and the F.B.I. in Denver should be immediately notified. A second bulletin sent less than an hour later stated that Ralph Vicory was a white male and gave his date of birth and the license plate number for his Monte Carlo.

By early the next morning, however, no arrests had been made and Agent Timms, after consultation with other agents working on the case, decided there was a good chance the couriers, that is, Jahnke, Vicory, Reed and "Arnie," who were believed to have left Modesto up to eight hours before the Fishers arrived there, had already reached the Denver area. Timms was afraid that the couriers might drop their narcotics somewhere before being stopped by Colorado police officers pursuant to his earlier bulletin and so expose the F.B.I. investigation at a time when nothing could be gained from it. Accordingly, he sent out another teletype cancelling the prior bulletin. In spite of this cancellation, a short time later a state highway patrolman spotted Ralph Vicory's automobile on the interstate in Wyoming and through the patrol's dispatcher contacted Timms requesting instructions. Being so informed that his calculations about the probable location of at least one courier were incorrect, Timms told the Wyoming trooper to stop the vehicle and arrest the driver. He also then issued another bulletin giving the information he had acquired about James Jahnke through Detective Simpson, including date of birth, physical description, and the description and license number of his automobile.

After Vicory was stopped and arrested, a decision was made by an Assistant United States Attorney in Colorado to conduct a warrantless search of the vehicle. The F.B.I. agent who actually conducted that

search reported to Denver before noon that he had found six plastic bags in a briefcase in the trunk of the vehicle, and that each bag appeared to hold one to two pounds of a powdery substance (subsequently determined to be amphetamine).

In the meantime, the Mercury Cougar known to be driven by Jack Houser had been followed across Nevada and Utah. The car was observed to be driven at about 45 to 50 miles per hour. This was very slow for the long desert-type roads being traveled and tended to make surveillance extremely difficult. The car was also seen to pull off the road at rest stops where it would sit and wait without either occupant leaving the vehicle, and on a couple of occasions the car drove off an exit ramp and sat underneath the underpass. These actions appeared to the observing agents to be what are known to officers experienced in surveillance as "cleaning" maneuvers, that is, attempts to detect or confound surveillance.

Finally, shortly after noon on Monday, January 24 and within a few hours of the arrest of Vicory, Maxwell Burgson, one of the F.B.I. agents then following the Cougar, made a telephone call to Agent Timms' supervisor in Denver, who was assisting Agent Timms in coordinating the investigation, and received orders to stop the Cougar. The decision to make the stop had been reached by Timms after he learned that Ralph Vicory had been granted permission to make a telephone call by the sheriff's office where he was being detained. When Burgson indicated that the agent in the car with him, who had been on the surveillance of the Cougar since it left the Modesto house, did not feel they had probable cause, he was told that there was probable cause at Denver's end and not to worry about it. Pursuant to orders, Burgson then asked for and received the assistance of the Wyoming Highway Patrol in making the actual stop at about 1:30 p.m.

Immediately after the stop of the Cougar, one of the highway patrol units that had been positioned east of the stop location as a backup, drove past the stop site slowly to see that there was no trouble with the stop and then proceeded westward on the interstate. Shortly, he noticed an older blue or turquoise 4-door automobile with what appeared to be Minnesota plates go past on the eastbound side of the highway. Having seen the F.B.I. teletype on Jahnke earlier, the patrolman turned his patrol car around and followed the turquoise automobile back past the place where Houser's Cougar was still located until he could get close enough to confirm that the turquoise car was indeed an Oldsmobile with the license plate number given for Jahnke in the teletype. The patrolman then called for assistance and stopped and arrested Jahnke.

Both the Houser and the Jahnke vehicles were submitted to warrantless searches by the F.B.I. before being moved off the interstate. In the Houser vehicle agents found a suitcase which contained wrapped packages. One of the packages held numerous polaroid photographs of a laboratory setup and of a considerable amount of a white powdery substance lying on a table. Other packages contained chemical and glassware supply house catalogs and a notebook with chemical formulae and step by step instructions for the production of amphetamine. In Jahnke's car agents found 12 plastic bags containing a white powder, eventually determined to be amphetamine, inside a briefcase and a duffel bag.

Sometime the following morning, Tuesday, January 25, 1983, Agent Timms received a telephone call from a confidential source who had direct personal knowledge that Dennis Swingler had left the Nevada-Utah state line during the night of January 24 and 25. This was the first indication of the U-Haul's position since Beth Fisher's call on Sunday evening. At 1:30 in the afternoon of the 25th Timms issued another all-points bulletin requesting, in connection with the continuing investigation of Sons of Silence motorcycle gang narcotics trafficing, a lookout for a mid-size U-Haul brand truck driven on Interstate 80 by Dennis Swingler. The bulletin indicated that the truck was believed to contain an

amphetamine laboratory with chemicals and requested that Swingler be arrested and the vehicle be held until a search warrant could be obtained.

Late in the afternoon of the 25th, a Wyoming State Trooper who had participated in the stops of the Houser and Jahnke vehicles the previous day was westbound on Interstate 80 when he spotted a U-Haul truck driven by what he later described as a bearded "biker-type" in the eastbound lane. He notified other patrol units and F.B.I. agents traveling with him that he thought it would be worthwhile to check to see who was driving the van. He proceeded to turn his patrol car around to follow the U-Haul and then, after receiving back-up assistance, stopped the van. The patrolman, without pulling his weapon as for a felony stop, approached the driver. When the driver asked if he had done anything wrong the patrolman told him no, that he merely needed to see some identification. The driver offered a driver's license identifying himself as Dennis Ray Swingler. The trooper asked him to wait a minute and then went back to another trooper pulled up behind the van and told him that this was the subject of the F.B.I. bulletin. The first trooper then drew his weapon and made a felony arrest of Swingler.

An F.B.I. agent who participated in the stop of the U-Haul took custody of the van and drove it to a temporary storage facility where it was kept under guard until a search warrant was obtained a day or so later. It was decided to wait for the issuance of a warrant, instead of proceeding with a warrantless search as with the other stopped vehicles, because the pace of events had slacked off from the rapid succession of arrests on Monday, and because F.B.I. internal regulations required the presence of specially trained personnel whenever suspected drug laboratories involving possibly dangerous chemicals were to be searched. The van was eventually searched with the assistance of a chemist from the Drug Enforcement Administration. Inside were numerous items of household furniture and personal effects along with some 40 boxes containing labo-

ratory equipment, five carboys of sulfuric acid, and several other chemicals used in the production of amphetamine.

### *The Arrests of Vicory, Houser, Jahnke and Swingler*

The defendants Vicory, Houser, Jahnke and Swingler assert that the officers who arrested them did not possess sufficient probable cause to justify making the arrests without first obtaining warrants. Though the defendant Jerald Richardson was arrested at the same time and in the same manner as Jack Houser, he did not argue this issue on appeal.

■ The starting point for our inquiry into the legality of these arrests is the guiding rule explained by the Supreme Court in the following passage from *Beck v. Ohio*, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). In that case, speaking of a particular warrantless arrest, the Court said:

> Whether that arrest was constitutionally valid depends ... upon whether, at the moment the arrest was made, the officers had probable cause to make it—whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [arrestee] had committed or was committing an offense.

*Id.* at 91, 85 S.Ct. at 225. The amount and quality of information necessary for probable cause to make a warrantless arrest is neither greater nor less than that needed for a magistrate to validly issue a warrant, *United States v. Watson,* 423 U.S. 411, 423, 96 S.Ct. 820, 827, 46 L.Ed.2d 598 (1976); *Whiteley v. Warden,* 401 U.S. 560, 566, 91 S.Ct. 1031, 1035, 28 L.Ed.2d 306 (1971), but is significantly less than what is necessary to prove an accused's guilt. *Brinegar v. United States,* 338 U.S. 160, 172–174, 69 S.Ct. 1302, 1309–1310, 93 L.Ed. 1879 (1949). "In dealing with probable cause, ... as the very name implies, we deal with probabilities. These are not tech-

nical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Id.* at 175, 69 S.Ct. at 1310, quoted in *Illinois v. Gates*, 462 U.S. 213, 231, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527 (1983). We also have endorsed the view that "probable cause can rest upon the collective knowledge of the police, rather than solely on that of the officer who actually makes the arrest." *United States v. McManus*, 560 F.2d 747, 750 (6th Cir.1977) quoted in *United States v. Merritt*, 695 F.2d 1263, 1268 (10th Cir.1982).

At one time a somewhat more stringent test was applied to assertions of probable cause based upon information received through an informant. This test, which was implemented by the Supreme Court in *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) and *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), required independent assessment of the veracity or reliability of the informant and of the informant's "basis of knowledge" for the particular assertions purporting to create probable cause. This "two-pronged test" was, however, expressly abandoned by the Court in *Illinois v. Gates*, 462 U.S. at 238, 103 S.Ct. at 2332, in favor of the more traditional "totality of the circumstances" analysis outlined above.[3]

■ The defendants note correctly, however, that "in absence of an applicable federal statute the law of the state where an arrest without warrant takes place determines its validity" even for federal crimes. *United States v. Di Re*, 332 U.S. 581, 589, 68 S.Ct. 222, 226, 92 L.Ed. 210 (1948). Here the arrests contested all occurred within the state of Wyoming and were accomplished initially by Wyoming law en-

forcement officers. Nonetheless, this fact does not alter the applicable law since the Wyoming Statutes § 7–2–103 (1977), authorize peace officers to make warrantless arrests provided there is probable cause to believe the suspect has committed a felony. The Wyoming Supreme Court's understanding of "probable cause" tracks exactly the *Brinegar* formulation of the "totality of the circumstances" or "prudent man" standard discussed *supra*. *See Ostrowski v. State*, 665 P.2d 471, 475–476 (Wyo.1983). Wyoming also has never specifically adopted the *Aguilar-Spinelli* "two pronged test" and recently cited *Gates* in upholding a magistrate's finding of probable cause. *Bonsness v. Wyoming*, 672 P.2d 1291, 1293 (Wyo.1983).

■ In the present case, for months prior to the California trip, Beth Fisher was known by the F.B.I. to be a trustworthy informant. The record discloses no basis for reversing the finding made by the district judge who conducted the hearing on the defendants' motion to suppress that Mrs. Fisher was both a credible and reliable informant. *See United States v. Pappas*, 735 F.2d 1232, 1233, (10th Cir.1984). It must be granted that the information the F.B.I. received through Beth Fisher was hearsay and for the most part doubly so, having been acquired only through her husband Bob. The fact that such evidence would not be admissible for the purpose of proving guilt at trial did not, however, make it unusable as a source of probable cause. *Brinegar*, 338 U.S. at 172–173, 69 S.Ct. at 1309; *Draper v. United States*, 358 U.S. 307, 311–13, 79 S.Ct. 329, 331–33, 3 L.Ed.2d 327 (1959). In addition, Beth Fisher's information was often corroborated and never contradicted by indepen-

---

**3.** Defendants suggest on appeal that *Gates* should not be applied to the present case because it was decided after their arrests were made. The High Court itself, however, has had no compunction about applying *Gates* retroactively to events occurring long before those presently at issue. *See Massachusetts v. Upton*, —— U.S. ——, 104 S.Ct. 2085, 80 L.Ed.2d 721 (1984). Retroactive application of decisions is not inappropriate when it cannot frustrate any

legitimate reliance interest, and, as the Court noted in *United States v. Ross*, 456 U.S. 798, 824 n. 33, 102 S.Ct. 2157, 2172 n. 33, 72 L.Ed.2d 572 (1982): "Any interest in maintaining the status quo that might be asserted by persons who may have structured their business of distributing narcotics or other illicit substances on the basis of judicial precedents clearly would not be legitimate."

dent F.B.I. investigation both before and during the California expedition in January of 1983.

■ Prior to the California trip, Beth Fisher told the F.B.I. that Ralph Vicory was to be one of the couriers who would transport 12 pounds of amphetamine from California to Denver. On Friday evening before the journey began, she reported that Ben Reed had obtained a gram of amphetamine for Vicory to use on the trip and that Reed had given some reason to expect the couriers would be using interstate 80. After Beth and her husband visited the house in Modesto, the information she gave to the F.B.I. indicated that Vicory was at that time already en route to Colorado with 12 pounds of amphetamine. The F.B.I. also had from Beth and from independent investigation a description and license plate number for the automobile Vicory was likely to be using. Although Agent Timms on Monday morning cancelled his earlier all-points bulletin for Vicory, believing the couriers to be already in Colorado, the fact that Vicory was shortly thereafter discovered heading west on Interstate 80 in Wyoming was nonetheless to some extent corroborative of the other information that he was in transit carrying contraband. All facts and circumstances considered, there was abundant probable cause upon which to base a warrantless arrest of Vicory.

■ Similar considerations apply to the arrest of Jahnke, except that by the time of his arrest the F.B.I. had the further corroborating evidence of the 12 pounds of white powder discovered in Vicory's car.[4] Again, with the combination of information obtained from Beth Fisher and through independent investigation, the F.B.I. had reason to expect Jahnke to be transporting contraband to Colorado from California in a particular automobile with a known license plate number. We find no basis whatsoever for reversing the trial court's finding of probable cause for this arrest.

■ The circumstances of Houser's arrest are somewhat different. Houser was not named by Beth Fisher as one of the couriers and, indeed, had never been mentioned by her to the F.B.I. His name did arise, however, in connection with the F.B.I.'s investigation of the phone number Bob gave Beth the night before they left for California. Through this investigation, it was learned that Houser had been trained specifically to operate an amphetamine laboratory and that he was also involved in the distribution of that drug along with Glen Gary and Cecilia Martinez who were residents of the house on 1219 Dakota Avenue in Modesto, the same house subsequently used as a contact point by Sons of Silence courier Bob Fisher. Through surveillance of the Modesto house on the afternoon of January 23, a Mercury Cougar registered in Houser's name was observed to be loaded with objects from the house by a person who appeared to be attempting to keep the items from being seen. After the Cougar left the house and headed east following the same route taken by the Fishers and the other couriers, the driver of the vehicle was determined to be in fact Houser. On the road east the Cougar was observed to be driven in a manner understandable as an attempt to evade surveillance by law enforcement personnel.

While the evidence was not so definite as that available with regard to Vicory and Jahnke, we feel the cumulative effect of these facts about Houser was substantial enough that the F.B.I. had good reason to believe Jack Houser was a participant in the conspiracies to transport amphetamine and an amphetamine laboratory to Colorado and also to believe that the Cougar probably contained contraband relevant to those conspiracies. The trial court's finding to that effect was not clearly erroneous.

■ The government does not contend that the trooper who made the initial stop of the U-Haul truck driven by Dennis Swingler had probable cause before he asked for and received positive identification of the driver. However, since the Supreme

---

4. The legality of the warrantless search of Vicory's vehicle is discussed *infra*.

Court decided *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), it has regularly been held that a law enforcement officer having specific grounds for suspecting that an individual is or has been engaged in criminal activity may stop that individual briefly to investigate and request identification even though the officer's grounds for suspicion do not amount to probable cause. *See United States v. Cortez*, 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981); *United States v. Merritt*, 695 F.2d 1263 (10th Cir.1982); *United States v. Martin*, 636 F.2d 974 (5th Cir.1981); *Lopez v. State*, 643 P.2d 682 (Wyo.1982). Here the defendant Swingler does not contend on appeal that the stop was illegal. Such a challenge would have little chance of success, in any event, given the knowledge possessed by the trooper at the time of the stop. *Cf. Cortez.* Though the driver of the truck was detained, the officer clearly indicated that he was not under arrest before Swingler identified himself. With the positive identification, probable cause for the arrest was created on the basis of Beth Fisher's information that "Oarless" was transporting the laboratory and Detective Simpson' identification of "Oarless" with Dennis Ray Swingler.

In sum, our analysis of the record discloses no reversible error in the trial court's determination that the arrests in this case were legal.

### The Vehicle Searches and Seizures

The Supreme Court has interpreted the Fourth Amendment to the Constitution [5] to generally forbid searches and seizures made without the authorization of a duly obtained warrant. In *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), the Court said "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a

few specifically established and well-delineated exceptions." *Id.* at 357, 88 S.Ct. at 514. One of the exceptions noted in *Katz* was the so-called "automobile exception" created by the Court in *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925).

The *Carroll* Court was called upon to determine the legality of a warrantless search by federal prohibition agents of an automobile driven by known bootleggers. Supporting its conclusion with an examination of the long history of congressional enactments recognizing the reasonableness of warrantless searches to detect the transportation of contraband, the Court held:

On reason and authority the true rule is that if the search and seizure without a warrant are made upon probable cause, that is, upon a belief reasonably arising out of circumstances known to the seizing officer, that an automobile or other vehicle contains that which by law is subject to seizure and destruction, the search and seizure are valid.

267 U.S. at 149, 45 S.Ct. at 283–284. The Court has unwaiveringly upheld the validity of this *Carroll* exception, and in *United States v. Ross*, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982) clearly defined its reach:

[T]he scope of the warrantless search authorized by [the *Carroll*] exception is no broader and no narrower than a magistrate could legitimately authorize by warrant. If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search.

456 U.S. at 825, 102 S.Ct. at 2172.

■ Some of the present defendants claim in their appellate brief that the automobile exception applies only when there are exigent circumstances. This view has never been endorsed by the Supreme Court

---

**5.** The Fourth Amendment states:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

and is in fact inconsistent with that Court's development of the exception. In *Michigan v. Thomas*, 458 U.S. 259, 102 S.Ct. 3079, 73 L.Ed.2d 750 (1982) for example, the Court said:

> It is ... clear that the justification to conduct such a warrantless search does not vanish once the car has been immobilized; nor does it depend upon a reviewing court's assessment of the likelihood in each particular case that the car would have been driven away, or that its contents would have been tampered with, during the period required for the police to obtain a warrant.

458 U.S. at 261, 102 S.Ct. at 3081; *see also Ross*, 456 U.S. at 807 n. 9, 102 S.Ct. at 2163 n. 9.

■ The defendants also attempt to extend their argument that the state law governs warrantless arrests to encompass warrantless searches as well. The authorities they cite, however, *Di Re, United States v. Watson*, 423 U.S. 411, 420–421 n. 8, 96 S.Ct. 820, 826–827 n. 8, 46 L.Ed.2d 598 (1976) and *Simpson v. United States*, 346 F.2d 291 (10th Cir.1965), make no mention of the automobile exception to the Fourth Amendment's ban on warrantless searches and seizures. Neither do the Wyoming cases cited. *Lopez v. State*, 643 P.2d 682 (Wyo.1982) dealt with a search of an automobile incident to an arrest which the Wyoming court appropriately found to be governed by *New York v. Belton*, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981). There was no need in *Lopez* to consider whether the police had probable cause to search since the stolen weapon in question was in plain view in the passenger compartment of a vehicle stopped after a chase. In *Parkhurst v. State*, 628 P.2d 1369 (Wyo. 1981) the court's finding that there was a legitimate expectation of privacy in the contents of the trunk of an automobile under both the United States and the Wyoming State Constitutions was relevant only to the question of the defendants' *standing* to challenge a search and seizure. The search itself was found to have been made by consent. 628 P.2d at 1378. Nothing in any of the cases cited indicates that the Wyo-

ming Supreme Court has interpreted the Wyoming State Constitution to be more restrictive with respect to warrantless searches of automobiles than the Fourth Amendment as interpreted by the United States Supreme Court in *Ross*. The defendants' appeal to state law is therefore wholly without merit.

■ In the present cases, the same facts recounted *supra* as justifying the warrantless arrests of Vicory, Houser and Jahnke, suffice also to support the warrantless searches of the vehicles they drove. In each case the F.B.I. had reason to believe that the automobile in question, more probably than not, contained contraband. The defendant Swingler has not contested the sufficiency of the warrant issued for the search of the U-Haul and his allegation of a "taint" resulting from the circumstances of his arrest has already been adequately answered.

### The Search of Larry Richardson's Residence

■ The defendant Larry Richardson was arrested in Okoboji, Iowa, on June 8, 1983, having eluded law enforcement agencies for more than four months after the arrests of the other defendants. At the time of the California expedition in January of 1983, however, Agent Timms had reliable information, both from Beth Fisher and from other sources during his yearlong investigation of the Sons of Silence, that Larry Richardson had been for a long time heavily involved in the illegal distribution of controlled substances and was in fact the originator, and intended to be the primary beneficiary, of the California expedition itself. On the day that Vicory, Houser, Gerald Richardson (Larry's brother) and Jahnke were arrested, January 24, 1983, Agent Timms still anticipated that the remaining couriers, that is, "Arnie" and Ben Reed, might have already reached the Denver area. Accordingly, Timms obtained a search warrant for Larry Richardson's residence, and a search was conducted.

Richardson argues on appeal that the evidence seized from the house [6] should have been excluded from his trial because the warrant was not supported by probable cause satisfying the requirements of *Illinois v. Gates*, discussed *supra*. We find this argument to be meritless. This court would be remiss if it did not uphold the finding of probable cause by the magistrate and district court below as dictated by an overwhelming amount of information concerning Larry Richardson's complicity in on-going narcotics trafficking in general and in the California conspiracies in particular.

*The Claim That Counts I and II of the Indictment were Multiplicitous*

Count I of the indictment alleges that the present defendants/appellants, and Carl Elsner, Bennie Ray Reed, and Dan P. Frojd, (not involved in this appeal), conspired with Bob Fisher, an unindicted co-conspirator, and other unknown persons to distribute amphetamine in violation of 21 U.S.C. § 841. The alleged conspiracy itself is a violation of 21 U.S.C. § 846. The indictment alleges that this conspiracy lasted from January 1, 1981, or thereabouts to approximately February 5, 1983. Count II alleges that the same individuals conspired to manufacture amphetamine, beginning on or about October 4, 1982, and ending on or about February 15, 1983. Count II involves the same substantive statute, 21 U.S.C. § 841 and the same conspiracy statute, 21 U.S.C. § 846, involved in Count I, and identical overt acts were alleged in support of both indictments. The defendants claim that these counts are multiplici-

tous, charging them for what was in fact a single conspiracy in more than one count. *Cf. Ward v. United States*, 694 F.2d 654, 660 (11th Cir.1983); *United States v. De La Torre*, 634 F.2d 792, 794 (5th Cir.1981).[7]

The usual analysis of an indictment alleged to be multiplicitous is derived from the following passage from *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932): "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." Here, however, the act or transaction in question is the act of agreement constituting a conspiracy and, in place of one act violating two statutes, it is alleged that we have two acts or agreements violating one statute, § 846. The *Blockburger* analysis simply does not apply. As stated in *Ward v. United States*,

> When the charges alleged to be multiplicious are overlapping or similar *conspiracies*, however, the issue is more complex, and depends primarily upon whether the separate conspiracies alleged are each based upon a general federal conspiracy statute ... or instead are based on separate provisions outlawing specific types of conspiracies.

> . . . . .

> When ... the separate conspiracies are both founded upon a general conspiracy statute, the relevant inquiry is whether

---

**6.** The F.B.I. agents making the search pursuant to the warrant found copies of The Modesto Bee, a newspaper published in Modesto, California, that contained news stories about the arrest of Glen Gary. They also found, among other things, wrapping paper bearing Cecilia Martinez' name and a Modesto address, a glass vial marked "speed" containing a white powder, and a duffel bag belonging to James Jahnke.

**7.** The government urges us to abstain from confronting the issue of multiplicity with respect to the defendants Houser, Jahnke and Jerald Richardson because they received only concurrent sentences upon their convictions under both

Counts I and II. It would not, however, behoove us to determine whether these defendants fall within the limited scope of the concurrent sentence doctrine we now recognize, *see United States v. Montoya*, 676 F.2d 428 (10th Cir.1982), since the defendant Larry Richardson received consecutive five-year sentences under the same counts. Because we must determine the multiplicity issue for him, the motive of judicial economy behind the doctrine is not available here. *See Benton v. Maryland*, 395 U.S. 784, 799, 89 S.Ct. 2056, 2065, 23 L.Ed.2d 707 (1969) (Justice White concurring).

there existed more than one *agreement* to perform some illegal act or acts.

694 F.2d at 661 (emphasis in original).

It is also clear that the defendants' attempt to bring this case within the ambit of *Albernaz v. United States,* 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981) and *Braverman v. United States,* 317 U.S. 49, 63 S.Ct. 99, 87 L.Ed. 23 (1942) is misguided. In *Braverman* the government admitted, both at trial and on appeal, that only one continuing conspiracy had been proven but sought multiple punishments under the same conspiracy statute solely on the basis that the one conspiracy had several illegal objects. 317 U.S. at 51, 63 S.Ct. at 100. No such admission has been made in this case, indeed the government argues that two distinct conspiracies were both proven and recognized by the jury. *Albernaz* is also distinguishable because it involved only one criminal agreement which was found to violate two distinct (under *Blockburger* ) conspiracy statutes. Here only one conspiracy statute is alleged to have been violated but, again, by two distinct agreements.

The fact that identical overt acts were alleged in support of both counts is not dispositive of the question of whether there were two distinct agreements. As we have previously noted, "an indictment under Section 846 need not allege overt acts" *United States v. King,* 521 F.2d 61, 63 (10th Cir. 1975). Thus the 26 overt acts set forth for each count are basically surplusage and not determinative of the elements of the crimes alleged. *Id.* In order to decide this issue, therefore, "we are free to look beyond the face of the indictment and examine the trial record." *Ward,* 694 F.2d at 662; *United States v. Marable,* 578 F.2d 151, 153 (5th Cir.1978). What we have is a question of fact and proof which is essentially the same as the basic question raised in those cases where a defendant claims there was at trial a prejudicial variance because the indictment alleged one conspiracy while the

proof demonstrated several. In the latter situation, the cases are legion that hold the existence of more than one conspiracy to be a question of fact for the jury. *United States v. Drougas,* 748 F.2d 8 (1st Cir. 1984); *United States v. Potamitis,* 739 F.2d 784 (2nd Cir.1984); *United States v. Dickey,* 736 F.2d 571 (10th Cir.1984); *United States v. Lee,* 695 F.2d 515 (11th Cir. 1983); *United States v. Elam,* 678 F.2d 1234 (5th Cir.1982); *United States v. Grunsfeld,* 558 F.2d 1231 (6th Cir.1977). We see no reason why this rule should not also be applied in the present circumstances; in either type of case the question is whether one or multiple conspiracies were established by the proof.

In the trials from which these appeals are taken, the jurors were adequately instructed that they could not find a defendant guilty of more than one count of conspiracy unless they were convinced beyond a reasonable doubt that he entered into two separate agreements to violate the law. The fact that Houser, Jahnke, Jerald Richardson and Larry Richardson were each found guilty of both conspiracy counts while Swingler was found guilty only of the second conspiracy count (manufacture) and Vicory was found guilty only of the first conspiracy count (distribution) [8] is proof that the juries did find two separate agreements and that at least the first jury undeniably distinguished between them.

All that remains of the defendants' allegation of multiplicity, therefore, is a challenge to the sufficiency of the evidence to support the jury's findings. It is settled law in this circuit that

[w]hen faced with a challenge to the sufficiency of the evidence following a jury verdict of guilty we are required to view the evidence in the light most favorable to the Government and to determine whether there is sufficient substantial proof, direct and circumstantial together with reasonable inferences to be drawn therefrom, on which the defendant could

---

**8.** All six defendants were found guilty of Count IV of the indictment which charged travel in interstate commerce to facilitate the promotion, establishment and carrying on of an unlawful activity.

be found guilty beyond a reasonable doubt.

*United States v. Wilson,* 719 F.2d 1491, 1493–1494 (10th Cir.1983).

In the present cases, the government had the testimony of Bob Fisher to substantiate its claim that the defendants were engaged in the illegal distribution of amphetamine long before the decision was made to send couriers to California to acquire the drugs and laboratory subsequently seized by the F.B.I.[9] Fisher's testimony showed that he and other members of the motorcycle gang were dealing in drugs as early as January, 1981, the date given in the indictment for the approximate beginning of the conspiracy charged in Count I. Fisher also indicated that he sold amphetamine for Larry Richardson several months before Richardson ever talked to him about the California trip. Fisher testified that Larry Richardson obtained his amphetamine from the Barhoppers motorcycle gang in California and, in particular, from Glen Gary and Jack Houser. It was not until Gary had been sent to prison on his murder conviction and the amphetamine business was left under Houser's control that Richardson became dissatisfied and began to suggest that the Sons of Silence bring the laboratory back to Colorado.

We find on the record before us, that there was ample evidence presented at both trials from which the juries could conclude that Houser, Jahnke, and Jerald and Larry Richardson were guilty beyond a reasonable doubt of two distinct criminal conspiracies. There was therefore no error in the trial court's refusal to find Counts I and II of the indictment multiplicitous.

### The Severance Motions

■ The defendants Houser and Jerald Richardson argue that the trial court erred by refusing to grant their motions for severance based upon allegations of antagonistic defenses and disparate evidence. The litany of general principles this and other courts have found applicable to the review of denials of severance motions has been so oft repeated that it is unnecessary to chant its entirety here again. Our own cases on the matter have been adequately summarized in *United States v. Peterson,* 611 F.2d 1313, 1331 (10th Cir.1979). Suffice it to say that a review of the cases will disclose that such denials by trial courts are rarely found to be grounds for reversal and that a defendant appealing from a denial of severance must indeed "bear a heavy burden of showing real prejudice to his case." *Id.*

■ It is clear at the outset that Houser has not met this burden with respect to the argument that a severance should have been granted based upon an alleged disparity of evidence. Houser has merely adopted by reference Richardson's arguments in this regard pursuant to Rule 28(i) of the Rules of Appellate Procedure. Richardson's discussion, however, is supported by citations to evidence in the record that are relevant only to Richardson and shed no light whatsoever on what prejudice Houser may have suffered by any disparity. There is substantial evidence in the record to support Houser's convictions, and we decline to hold that the above-cited rule of appellate procedure obliges us to manufacture an argument for a defendant just because he refers us to an inapplicable argument made by another defendant.

■ Richardson's argument itself is unconvincing. He alleges that, at trial, Beth Fisher "squarely contradicted" Bob Fisher's very clear testimony indicating Richardson's involvement in the conspiracies and substantive travel offense. Bob Fisher

---

**9.** After Beth Fisher was taken into protective custody in Reno, Nevada, Bob Fisher spent nearly a day looking for her in that city. He then telephoned his brother in Denver who had been taking care of Bob and Beth's son while they were on the trip. At that time Bob learned that the F.B.I. had taken his son into protective custody. He returned to Denver and eventually, convinced that Beth was cooperating with the F.B.I., agreed to cooperate himself. Between the two trials the present defendants appeal from, Bob Fisher pled guilty to three counts of conspiracy to distribute amphetamine and received three concurrent five-year terms of imprisonment.

testified that Jerald Richardson helped conduct the meeting at which the final plans for the California expedition were formulated. Part of the plan was that Jerald, being Larry Richardson's brother, was to get for himself a little more than the two pounds of amphetamine each carrier was to receive for participating in the scheme. Bob also testified that Jerald was part of an advance party that went out to California to set things up before the couriers began their trip. Beth Fisher contradicted *none* of this testimony and never purported to be in a position to evaluate its veracity. The only part of Bob's testimony that she did contradict was his assertion that he had told her about Jerald's involvement.[10] We are also not persuaded that Bob's frank admission on the stand that he did not like Richardson served to discredit his testimony about him, particularly since that testimony occurred in the midst of, and was no different in character from, equally damning testimony about the other defendants. In any event the jury was in a better position to evaluate Bob Fisher's credibility than are we, and they apparently decided to believe him. *See United States v. Twilligear,* 460 F.2d 79, 82 (10th Cir.1972) ("Evaluating the credibility of witnesses is a matter for the jury, not for the appellate court.") *see also Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). On the record, we do not find that there *was* any great disparity between the amount of damaging evidence presented against Richardson and that presented against the other defendants. We, therefore, could not reverse the denial of severance in this case on the grounds of disparity even if we were generally inclined to grant severances for such reasons, which we are not. *See United States v. Mansaw,* 714 F.2d 785, 790–791 n. 5 (10th Cir.1983) *citing with approval United States v. Knife,* 592 F.2d 472, 480 (8th Cir.1979). The cases cited by Richardson in support of his line of reasoning, *United States v. Danzey,* 594 F.2d 905 (2nd Cir.1979) and *United States v. Sampol,* 636 F.2d 621 (D.C.Cir.1980), are clearly distinguishable on their facts and are extreme cases.

The other argument raised by these defendants in opposition to the denial of severance alleges that their defenses were mutually antagonistic. Essentially, Jerald Richardson's defense at trial took the form of a general disclaimer of involvement in the conspiracies. Counsel for Houser, on the other hand, directed his efforts toward showing that his client's participation was under duress or coerced by members of the Colorado gang who had known proclivities for violence and an expressed intent to "rip off" Houser's California drug operation. Since Richardson was accompanying Houser in his Cougar when it was stopped in Wyoming, Richardson argues that Houser's defense necessarily implied that he, Richardson, was the agent who coerced Houser's cooperation by threats of violence. Richardson claims that for this reason it would not have been possible for the jury to accept Houser's defense without convicting Richardson.

Again, it is not so clear how Houser feels he was prejudiced by Richardson's defense because he merely adopted Richardson's argument. We will assume for the purpose of our discussion, however, that Houser intends to mirror Richardson's claim by asserting that the jury could not have accepted Richardson's claim of non-involvement in the conspiracies without convicting Houser.

██ This court has, in the past, suggested that "[a]n antagonistic defense from a codefendant may require severance, particularly if that defense admits to some or all of the elements of the charge." *United States v. Roberts,* 583 F.2d 1173, 1177 (10th Cir.1978); *See also United States v. Calabrese,* 645 F.2d 1379 (10th Cir.1981). How-

---

10. The entire extent of Beth Fisher's trial testimony in regard to Jerald Richardson is contained in the following question and answer:

Q Okay. Now, during that—any of that period of time from when you first heard about the California conspiracy until the time you went to that house in Modesto, did you hear Jerry Richardson's name mentioned by your husband in connection with this matter?

A No.

ever, extensive research has disclosed that cases where the presence of antagonistic defenses has provided the basis for actual reversal of the denial of severance constitute an exceedingly small minority of all the cases in which courts of appeals have considered this issue. In fact, our research has uncovered but three reversals of this kind, all in the Fifth Circuit. These cases are: *United States v. Romanello*, 726 F.2d 173 (5th Cir.1984); *United States v. Crawford*, 581 F.2d 489 (5th Cir.1978); and *United States v. Johnson*, 478 F.2d 1129 (5th Cir.1973). *Cf. United States v. Magdaniel-Mora*, 746 F.2d 715 (11th Cir.1984) (only two such cases found in a survey of the circuits: *Crawford* and *Johnson* ). The essence of the Fifth Circuit rule concerning this matter is contained in the following excerpt from *Romanello:*

> To compel severance the defenses must be antagonistic to the point of being irreconcilable and mutually exclusive.... The essence or core of the defenses must be in conflict such that the jury, in order to believe the core of one defense, must necessarily disbelieve the core of the other.

726 F.2d at 177 (citation omitted).

Other circuits, when confronted with this problem, recite substantially similar language or a somewhat stronger variant originating in the former District of Columbia Circuit which requires that the conflict between co-defendant defenses be so intense that there is a danger the jury will unjustifiably infer from the conflict alone that both defendants are guilty. *See e.g. United States v. Haldeman*, 181 U.S.App.D.C. 254, 559 F.2d 31 (D.C.Cir.1976). The primary reason for the difference in result reached by the Fifth Circuit in *Romanello, Crawford,* and *Johnson* seems to lie in the facts of those cases.

In *Johnson,* a co-defendant made a confession that directly incriminated Johnson and completely contradicted the latter's theory of defense. Johnson's defense was that he was not present when the crime charged was committed. His co-defendant Smith, however, confessed that he passed the counterfeit bills in question, asserted that Johnson was with him when he committed the crime and further stated that Johnson was the procurer and original processor of the counterfeit money. Smith's defense was that he lacked the requisite *mens rea* because he was acting as a government informer in an unrelated investigation and as a secondary goal desired to see Johnson apprehended for the counterfeiting. At trial, Smith's attorney implicated Johnson at every opportunity, and Smith's confession was admitted to evidence without deletion of the references to Johnson. 478 F.2d at 1131–1133.

*Crawford* was a criminal prosecution for possession of ·an unregistered sawed-off shotgun. Its facts present an even more extreme situation than *Johnson* because in *Crawford both* defendants actively sought to directly incriminate the other:

> The sole defense of each was the guilt of the other. Blanks incriminated Crawford and exculpated himself at every opportunity. Crawford, on the other hand, attempted to show that he was not culpable because Blanks alone had possession of the firearm. Each was the government's best witness against the other. Each defendant had to confront not only hostile witnesses presented by the government, but also hostile witnesses presented by his co-defendant. Witnesses against each defendant were thus examined by one adversary and cross examined by another adversary.

581 F.2d at 492.

We have previously reviewed both *Johnson* and *Crawford* in *United States v. McClure*, 734 F.2d 484 (10th Cir.1984.) There we emphasized the fact that in each of these cases the Fifth Circuit based its decision upon an examination of the record for an actual showing of prejudice steming from the allegedly irreconcilable defenses. *Id.* at 488. We did not then have the benefit of *Romanello* which provides further insight into the Fifth Circuit's reasoning.

In *Romanello*, a picaresque tale of stolen Italian gold replete with quotations

from Dante's *Inferno,* the Fifth Circuit waxed erudite in its concern

> with the specific prejudice that results when defendants become weapons against each other, clawing into each other with antagonistic defenses. Like the wretches in Dante's hell, they may become entangled and ultimately fuse together in the eyes of the jury, so that neither defense is believed and all defendants are convicted.

726 F.2d at 174. In all fairness, it must be conceded that the facts of the case are amusing enough to tempt any court to prosaic, even poetic, exhuberance. One defendant, Vertucci, who was accused of committing the initial theft of gold chains from Italian couriers at the Houston airport, was discovered at 2:00 a.m. one December morning, handcuffed to a light pole at a location approximately a 50 minute drive from the airport. He accused the other two defendants, Romanello and Mendez, who were apprehended with the gold chains in their possession while speeding on the New Jersey Turnpike the following day, of having robbed him of the gold at gunpoint while he was making a purely legitimate transfer of the gold to a different terminal at the airport. They, in turn, claimed that they had innocently accepted a job to transport the gold to New York and asserted that Vertucci's story was a lie concocted to shield the real thieves. The government, for its part, argued that all three defendants were involved in the conspiracy.

 Each of these three cases contains a common element not present in the case at bar. In each of them at least one defendant made a direct accusation against a specific co-defendant. In the present case neither Houser nor Richardson directly attacked the other. The only part of Houser's case at trial that tended to implicate Richardson was the testimony elicited by Houser's counsel to show that *Larry* Richardson had referred to the California operation as a "rip off" and to show that "rip offs" by the Sons of Silence were sometimes accompanied by violence. There was no evidence of any kind introduced by Houser that *Jerald* Richardson had a purpose or intent to force Houser to act against his will, that he in fact made threats to or otherwise coerced Houser at any time, or that he personally had a reputation for using violent means to accomplish his own or the gang's objectives. Richardson asserts that Houser's counsel, in his closing argument, stressed the theory that Richardson may have threatened Houser with violence to rip off the laboratory. Richardson, however, did not designate this argument as part of the record on appeal, and it is not among the evidence now before us for review. The record we do have reveals no logical necessity for a jury that believed Houser's defense of coercion to conclude that Richardson was guilty. The evidence of intent to steal the laboratory with a possible resort to violence was either directed toward other members of the Sons of Silence or was nonspecific.

Similarly, a jury accepting Richardson's defense of noninvolvement would not be compelled to find Houser guilty if it believed Houser faced a sufficiently strong threat from the other members of the Sons of Silence. The obvious challenge that had Houser been traveling alone he would be expected to seek help from the police is without force because the Cougar in the actual case was stopped en route to Colorado by a California Highway Patrolman, and Houser then had an excellent opportunity to escape any threat from Richardson. Nothing in Richardson's defense was even inconsistent with Houser's, and it certainly contained no direct accusation against him.

In sum, neither Richardson's nor Houser's defense contained the sort of direct accusation that would have logically prevented the jury from accepting both theories, *see McClure,* 734 F.2d 488–489 n. 1, and there is insufficient basis for finding such actual prejudice as would require us to hold the trial judge abused his discretion in denying the severance. *Id.; Peterson,* 611 F.2d at 1331.

### Limitation of the Scope of Cross-Examination of Robert Fisher

Jerald Richardson and Houser argue that the trial court violated the Sixth Amendment and applicable rules of evidence and abused its discretion by limiting the scope of cross-examination of Robert Fisher with respect to the death of a parachutist possibly caused by members of the Sons of Silence. They also claim that it was error for the trial court to exclude extrinsic evidence about Bob's involvement in the incident through the testimony of Beth Fisher. The trial court limited counsel to asking Mr. Fisher whether he had ever committed a homicide, whether he was present at the death of the parachutist and whether his agreement with the government protected him from any prosecution arising out of that incident.

■ Defendants correctly note that the Sixth Amendment confrontation clause secures to them the right of "effective" cross-examination when attempting to show the existence of possible bias and prejudice on the part of a government witness. *Davis v. Alaska*, 415 U.S. 308, 317–318, 94 S.Ct. 1105, 1110–1111, 39 L.Ed.2d 347 (1974). It is also true that Federal Rule of Evidence 608(b) gives a trial court discretion to allow specific instances of the conduct of a witness to be inquired into on cross-examination for the purpose of attacking his credibility if they concern his character for truthfulness or untruthfulness. It must be added, however, that Federal Rule of Evidence 403 provides certain "overriding" considerations that entitle a trial judge to exclude evidence even though it may be relevant to assessing the witness' bias or character for truthfulness: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *See* Fed.R. Evid. 608(b) advisory committee note. We feel that this rule does not supercede, but

rather reaffirms the correctness of our holding in *Foster v. United States*, 282 F.2d 222 (10th Cir.1960) that

> in the last analysis the trial court is the governor of the trial with a duty to assure its proper conduct and the limits of cross-examination necessarily lie within its discretion. And we should not overrule the exercise of that discretion unless we are convinced that the ruling of the court was prejudicial.

*Id.* at 224. *Citing Glasser v. United States*, 315 U.S. 60, 82–83, 62 S.Ct. 457, 470–471, 86 L.Ed. 680 (1942).

■ As the parachutist incident was explained to the trial judge below by counsel, it was not clear that the death was in fact a criminal homicide. The event occurred nearly five years before the first of these trials at a crowded race track and involved a number of people, some of whom were apparently not members of the Sons of Silence and may have been members of another motorcycle gang. The parachutist apparently died of wounds he received during the incident but not immediately. No one had ever been prosecuted for the death though one man not involved in the present proceedings did plead guilty to a lesser included offense—this despite extensive publicity and the questioning of numerous witnesses by state law enforcement authorities. One of the Assistant United States Attorneys who participated in the trial below had been, at the time of the incident, one of the Deputy District Attorneys in Weld County, Colorado, who investigated the incident. He indicated that the murder case had every imaginable defense to it, including cause of death issues, identification issues and self-defense issues.

Beth Fisher had given a statement to the F.B.I. in which she claimed to be a close eye witness of the event and asserted that Larry Richardson had hit the parachutist with a doubled chain belt and that her husband Bob had kicked the parachutist in the head twice. She also said that Bob later told her he thought they had killed the man. Bob, for his part, admitted to the F.B.I. and on the witness stand at trial

below that he was present and an eyewitness of the incident and that he didn't think he should have been there. He also told the F.B.I. that he would have been involved in the killing had his wife (Beth) not pulled him away. In response to a question at trial, however, Bob denied that he had ever killed anybody.

There was, therefore, some inconsistency between Beth's and Bob's accounts of the incident, but not a direct and unequivocal contradiction. Beth's story tended more to criminally inculpate Bob. Bob, however, had no knowledge of what Beth had told the F.B.I. and had never been specifically asked whether he in fact struck the man who died. Even assuming Beth's story to be accurate, it is not inconceivable that Bob was ignorant of the fact that he could be prosecuted as a principal under an aider and abettor statute. Given that other people had assaulted the victim to a greater extent, Bob may not have believed he was personally responsible for the death.

Nothing in the proof offered to the trial judge conclusively established either Bob's complicity in a murder or that he had been untruthful in his statements to the F.B.I., his testimony before the grand jury, or his testimony at trial. Defendants urge that Bob's desire to avoid prosecution for this homicide was his primary motivation for agreeing to testify for the government and that his statement that he had never killed anybody therefore constituted a denial of the facts constituting his bias or interest which the defendants were entitled to rebutt with inquiry into collateral matters and even extrinsic evidence (that is, Beth's testimony). This assertion is simply not supported by the facts in the record.

There was extensive testimony by Bob Fisher, both on direct and cross, concerning numerous other crimes committed by him, including assault, robbery, tax evasion, wife-beating, perjury and, of course, drug abuse and sale. Though homicide is usually more serious than these crimes, it would not necessarily result in a greater penalty,[11] particularly under the circumstances described. Bob also testified that he thought his cooperation with the F.B.I. would help protect him from state prosecution for the parachutist's death. Any additional evidence of bias or interest arising out of the parachutist incident would have been cumulative on this record. "[W]hen reviewing the adequacy of a cross-examination, the question is whether the jury had sufficient information to make a discriminating appraisal of the witness' motives and bias." *United States v. De Gudino*, 722 F.2d 1351, 1354 (7th Cir.1983) *citing United States v. Fitzgerald*, 579 F.2d 1014, 1021 (7th Cir.1978). *See United States v. Haimowitz*, 706 F.2d 1549, 1559 (11th Cir. 1983); *United States v. Nunez*, 668 F.2d 1116, 1123 (10th Cir.1981); *United States v. Sampol*, 636 F.2d 621, 656–661 (D.C.Cir. 1980); *United States v. Singh*, 628 F.2d 758, 765 (2nd Cir.1980). We find that without the inquiry into Bob Fisher's participation in the parachutist incident, there was ample information available to the jury for them to fairly evaluate his likely bias and motivation.

### Failure to Give the Lesser Included Offense Instruction

Houser and Jerald Richardson also protest the trial court's refusal to instruct the jury on lesser included offenses. They assert that possession and possession with intent to distribute are lesser included offenses of the crime charged in Count I, that is, conspiracy to distribute.

"In the federal courts, it has long been 'beyond dispute that the defendant is entitled to an instruction on lesser included offense if the evidence would permit a jury rationally to find him guilty of the lesser offense and acquit him of the greater.'" *Beck v. Alabama*, 447 U.S. 625, 635, 100 S.Ct. 2382, 2388, 65 L.Ed.2d 392 (1980) *quoting Keeble v. United States*, 412 U.S. 205, 208, 93 S.Ct. 1993, 1995, 36 L.Ed.2d

---

11. Under Colorado statutes, for example, a conviction for manslaughter would carry a shorter prison term than the five years Fisher did receive on the drug charges he pled guilty to. *See* Colo.Rev.Stat. §§ 18–3–104, 18–1–105 (1978, 1984 Cum.Supp.).

844 (1973); *see also Hopper v. Evans*, 456 U.S. 605, 612, 102 S.Ct. 2049, 2059, 72 L.Ed.2d 367 (1982). Houser and Richardson fail to satisfy this basic test on several grounds.

■ First of all, these two defendants were not arrested with any amphetamine in their possession. Houser's automobile contained in its trunk a notebook and illustrative photographs giving step-by-step procedures for operating an amphetamine laboratory, but there was none of the drug itself. There was therefore absolutely no basis for a jury to convict them of possession of or possession with the intent to distribute the substance.

■ Secondly, possession and possession with intent to distribute are not lesser included offenses of conspiracy to distribute. *Black's Law Dictionary* (5th ed. 1979) defines "lesser included offense" in part as follows: "When it is impossible to commit a particular crime without concomitantly committing, by the same conduct another offense of lesser grade or degree, the latter is, with respect to the former, a 'lesser included offense.'" *Id.* at 812. *See also United States v. Brown*, 604 F.2d 557, 561 (8th Cir.1979); *Olais-Castro v. United States*, 416 F.2d 1155, 1157 (9th Cir.1969); *Waker v. United States*, 344 F.2d 795, 798 (1st Cir.1965); *Larson v. United States*, 296 F.2d 80, 81 (10th Cir.1961). To convict a defendant of conspiracy to distribute amphetamine, the government need only prove one overt act made by the defendant in furtherance of the conspiracy, and that act need not, as in the case of these defendants it did not, involve actual possession of the drug.

■ Thirdly, even had the defendants been in possession of amphetamine at the time of their arrest, the other evidence presented at trial amply supported a conviction for conspiracy and would not rationally permit a jury to find them guilty of the lesser offenses and not of conspiracy. *See Fitzgerald v. United States*, 719 F.2d 1069, 1071–1072 (10th Cir.1983).

For these reasons the defendants' arguments with respect to a lesser included offense instruction are without merit.

*The Denial of Houser's Motion for Judgment of Acquittal as to Count IV*

Count IV of the superceding indictment in this case alleged that the defendants, and other Sons of Silence members, traveled in interstate commerce from Denver, Colorado, to Modesto, California, between January 18, 1983, and January 25, 1983, with the intent to promote, establish, carry on, and facilitate an unlawful activity, to wit: a business enterprise involving the manufacture and distribution of amphetamine, all in violation of 18 U.S.C. § 1952. Houser raises the facile argument that since the only evidence in this case concerning interstate travel by him during the period stated showed not that he traveled from Denver to Modesto, but rather from Modesto to Wyoming, Count IV by its own language does not apply to him and should have been dismissed as to him. He further alleges that this literal failing of the Count is not avoided by its invocation of the aider and abettor statute, 18 U.S.C. § 2, because there was insufficient evidence that he acted or failed to act in any manner that could constitute aiding or abetting a violation of § 1952.

■ The established rule is that "[t]he verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). At trial, Robert Fisher's testimony revealed Houser's role as partner and eventual successor to Glen Gary in the operation of the California amphetamine business which supplied Larry Richardson with the amphetamine he sold in Colorado over an extended period of time. Fisher also testified that after the meeting at which the Sons of Silence finalized their plans for the California expedition, Larry Richardson called his amphetamine contact in California to apprise him of the plan. It would have been reasonable for the jury to infer

that this contact was Jack Houser who was cooperating in the scheme to transport the amphetamine and laboratory to Colorado. This and other evidence discussed supra provided ample basis for a jury to conclude that Houser aided and abetted the other defendants' violation of the Travel Act. Houser's argument is therefore without merit.

### Alleged Testimony by a Prosecution Witness Regarding Houser's Right to Remain Silent

Finally, Houser asserts that under cross-examination by Houser's counsel, an F.B.I. agent improperly commented upon Houser's exercise of his right to remain silent. The challenged exchange went as follows:

Q Did you have occasion to talk to Houser after he was arrested?

A I advised him of his rights when he was arrested, and he didn't want to make any statement.

Q Did you have a chance to observe Houser's condition?

A Yes, sir.

Q What did his—generally describe his condition.

A He did not want to make any statement. He was quiet.

Q No, now just a minute. I didn't ask you what he said. I said please describe his condition as it appeared to you at that time. Please do that.

MR. MURPHY: Excuse me, your Honor. Does he mean physical condition or mental? I don't know. I think there may be some confusion.

THE COURT: Well, are you talking about the totality of his condition?

MR. ROGERS: Well, let's start with his physical condition. I am sorry.

THE COURT: All right.

BY MR. ROGERS:

Q Please describe his physical condition as you observed it.

A Appeared to be normal.

Q Describe his emotional condition as you observed it.

A Appeared to be normal and quiet. It is obvious that Houser's counsel did not object or move to strike the testimony but rather apologized for having induced it as, in our view, was entirely appropriate. It is ·clear that the witness had no intention to make an improper comment on the defendant's exercise of a constitutional right. It is also clear that any prejudicial tendency of the witness' second statement about Houser's silence was ameliorated by the succeeding questions and answers. Beyond all doubt, any error that occurred at this point in the proceedings was harmless. *See United States v. Bridwell,* 583 F.2d 1135, 1139 (10th Cir.1978).

AFFIRMED.