FILED
United States Court of Appeals
Tenth Circuit

October 31, 2008

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

ARNOLDO ZAPATA, a/k/a Lolo;
SERGIO HERNANDEZ-ZAPATA,
a/k/a Tito, a/k/a Titillo, a/k/a Lucas;
LILIAN GALVAN, a/k/a Petunia,
a/k/a Yiya; JAIME ZAPATA, a/k/a
Rudy, a/k/a Jimmy, a/k/a Chasco,

Defendants - Appellants.

Nos. 06-1541, 06-1542, 06-1543
& 07-1001

**ORDER**

Before **TACHA**, **KELLY**, and **McWILLIAMS**, Circuit Judges.

Jaime Zapata has filed a petition for panel rehearing in 07-1001. Upon

consideration of his rehearing petition, the panel has amended the opinion

previously filed in this court. The amended opinion is attached to this order. The

petition for rehearing is denied.

Appellant Arnoldo Zapata's "motion for en banc" in 06-1541 is construed

as a petition for rehearing and is denied. Appellant Sergio Hernandez-Zapata's

petition for rehearing en banc in 06-1542 is denied. Appellant Lilian Galvan's

"motion for enbanc" in 06-1543 is construed as a petition for rehearing and is also denied.

No member of the court called for a poll in either of the en banc petitions.

Entered for the Court,

ELISABETH A. SHUMAKER
Clerk of the Court

2

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 9, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

ARNOLDO ZAPATA, a/k/a Lolo;
SERGIO HERNANDEZ-ZAPATA,
a/k/a Tito, a/k/a Titillo, a/k/a Lucas;
LILIAN GALVAN, a/k/a Petunia,
a/k/a Yiya; JAIME ZAPATA, a/k/a
Rudy, a/k/a Jimmy, a/k/a Chasco; and
HUMBERTO GALVAN, a/k/a Beto;

Defendants - Appellants.

Nos. 06-1541, 06-1542, 06-1543,
07-1001 & 07-1012

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D. Ct. No. 04-CR-403-LTB)**

---

Argued before the Court:

Philip A. Cherner, Esq., Law Office of Philip A. Cherner, appearing for Appellant
Sergio Zapata-Hernandez.

Richard N. Stuckey (Jennifer L. Gedde, with him on the briefs), Denver,
Colorado, appearing for Appellant Jaime Zapata.

Martha Paluch, Assistant United States Attorney (Troy A. Eid, United States
Attorney, with her on the brief), Office of the United States Attorney for the
District of Colorado, Denver, Colorado, appearing for Appellee.

Submitted on the briefs:[*]

Robert S. Berger, Denver, Colorado, for Appellant Arnoldo Zapata.

Antony M. Noble, The Joffe Law Firm, Denver, Colorado, for Appellant Lilian Galvan.

Megan L. Hayes, Laramie, Wyoming, for Appellant Humberto Galvan.

Before **TACHA**, **KELLY**, and **McWILLIAMS**, Circuit Judges.

**TACHA**, Circuit Judge.

Eighteen individuals, all members of the Zapata family or close family friends, were charged in a thirty-five-count indictment stemming from a large-scale cocaine trafficking scheme. Several of them pleaded guilty and testified against their co-defendants in exchange for reduced sentences. Five defendants ultimately were tried before a single jury and convicted of, among other counts, conspiring to distribute five kilograms or more of a substance containing cocaine. *See* 21 U.S.C. § 841(a)(1), (b)(1)(A)(ii). Those defendants—Sergio Zapata-Hernandez, Arnoldo Zapata, Jaime Zapata, Lilian Galvan, and Humberto Galvan—now individually appeal their convictions and sentences. Because of

---

[*]After examining the briefs and the appellate record, this three-judge panel has determined unanimously to honor the parties' requests in case numbers 06-1541, 06-1543, and 07-1012 for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The cases are therefore ordered submitted without oral argument.

overlapping factual and legal issues, we decide their appeals in this single opinion. We have jurisdiction under 28 U.S.C. § 1291, and we AFFIRM.

## I. BACKGROUND

Carlos Zapata was the undisputed leader of a cocaine trafficking operation and he would negotiate directly with an individual named "Primo" who resided in Juarez, Mexico. Primo supplied Carlos[1] with cocaine to distribute in the Denver, Colorado area. Carlos would travel to Juarez and pay Primo $11,500 for each kilogram of cocaine that Primo agreed to supply.

Carlos testified that the cocaine he purchased was also for his brothers Sergio Zapata-Hernandez, Jose Alfredo Zapata, Arnoldo Zapata, and Jaime Zapata, and his friends Fabian Miranda-Urbina and Efrain Venzor. These seven men were referred to as "owners" or "investors" in the operation. Each individual would pay Carlos in advance to buy specified numbers of kilograms from Primo. For example, Carlos testified that between April and August of 2004, on each of several trips to Mexico he generally bought ten to twelve kilograms for himself, ten kilograms for Sergio, two kilograms each for Arnoldo, Jaime, Jose Alfredo, and Efrain, and two to three kilograms for Fabian.

After Carlos paid Primo in Juarez, he would return to his home in Denver. Zapata family friends Jaime Armendariz and Arturo Jimenez smuggled the

_____

[1]Because many of the co-conspirators share the same last name, for clarity we will frequently use only their first names throughout the remainder of this opinion.

cocaine, which was hidden in their vehicles, across the border into El Paso, Texas. These two "transporters" delivered the drugs to the homes of Carlos's brothers, Jose Alfredo and Arnoldo, in El Paso. Mr. Armendariz, who was paid $500 per trip, testified specifically to at least twelve trips he made between Juarez and El Paso from April to August 2004; he also testified that he supplied Mr. Jimenez with loads of cocaine to transport into El Paso approximately forty to forty-five times. Each load contained about four or five kilograms.

Once the cocaine reached Jose Alfredo and Arnoldo in El Paso, Carlos would direct other transporters to drive the cocaine to Denver, usually hidden in eight- to nine-kilogram quantities in the vehicle's spare tire. These transporters included Jose's son Ramon and daughter Ana, who lived in El Paso; Carlos's sister Artemisa, who lived in Denver; and Carlos's other sister, Lilian Galvan, who lived in Denver and was always accompanied by her husband Humberto Galvan. The transporters were paid $1000 per kilogram per trip, plus expense money.

Carlos testified that when the cocaine reached Denver either he, Sergio, Fabian, or Efrain would unload it and be responsible for paying the transporter. One time, a shipment was unloaded at Carlos's brother Oscar's house during a family gathering. Oscar testified that he was paid $2000 for storing the cocaine for a brief period in his basement. After the cocaine was unloaded, it was divided among the investors for them to sell at $17,000 per kilogram. Carlos, Sergio, and

Jaime would sell their own shares, and at times they would sell kilograms for Jose Alfredo and Arnoldo.

Jesus Mejia was one of Carlos's regular customers. Mr. Mejia testified that between at least May 2002 and his arrest in February 2004, he bought loads of cocaine from Carlos to sell in Washington, D.C. At first, he bought every other month, but the frequency eventually increased to every month and then to twice per month. The amount of the loads also increased, from five kilograms at a time up to a high of twenty kilograms.

In December 2003, a Kansas state trooper stopped two of Mr. Mejia's smugglers as they were driving east near Manhattan. A consensual search uncovered twenty-one kilograms of cocaine in their vehicle's spare tire. Mr. Mejia testified that he paid $340,000 for this amount and could have sold it in Washington, D.C. for $500,000. The search and subsequent arrests of the smugglers produced evidence linking the cocaine to Carlos. Carlos's fingerprints were on the cocaine, and his phone number was stored in one of the smugglers' cell phones.

Mr. Mejia himself was arrested the following February after officers discovered twelve kilograms of cocaine in the vehicle he was driving. He agreed to cooperate with the government, and he later testified at the trial of the defendants in this case. According to Mr. Mejia, he and the two smugglers who were arrested in December 2003 made at least fifteen-to-twenty trips to smuggle

cocaine from Denver to Washington, D.C., with the total number of kilograms smuggled "over the hundreds, two hundreds."

Beginning in April 2004, federal agents received authority to tap several cell phone numbers registered to Carlos and Fabian, as well as three push-to-talk phones registered to Arnoldo. Carlos, Sergio, Arnoldo, Jaime, and Fabian were using the phones. The authority for the wiretaps was based in part on information uncovered from Mr. Mejia's arrest, his smugglers' arrests, and traditional investigative techniques such as surveillance. Federal agents intercepted many phone calls between Carlos and his siblings, among the siblings, and between the Zapatas and Fabian and Efrain. At trial, the jury heard more than sixty of these calls.

On August 22, 2004, an FBI agent monitored a call from Carlos to his sister Artemisa, during which Carlos asked Artemisa where she was. Artemisa stated that she was ten miles from Raton, New Mexico, and that their sister Lilian was about ten miles in front of her. Officers with the Colorado State Patrol subsequently stopped the vehicle in which Lilian was a passenger. Her husband, Humberto, was driving and gave consent to search. Officers found eight kilograms of cocaine in the vehicle's spare tire. They issued arrest warrants, and all of the defendants were arrested and taken into federal custody on August 31.

On September 21, a grand jury returned a thirty-five-count indictment against eighteen defendants, including the five appellants. Count One of the

indictment, the count most relevant to this appeal, charged all defendants with conspiring between May 1, 2002 and August 31, 2004 to distribute and possess with the intent to distribute five kilograms or more of a substance containing a detectable amount of cocaine in violation of 21 U.S.C. § 841(a)(1).

Only Sergio, Arnoldo, Jaime, and the Galvans proceeded to trial. The other defendants entered into plea agreements. In exchange for his cooperation, Carlos received a 180-month sentence, due in part to a departure under U.S.S.G. § 5K1.1(a)(1) for substantial assistance.

An eleven-day trial began on August 21, 2006. Government witnesses included Carlos, Jesus Mejia, Fabian Miranda-Urbina, Jaime Armendariz, Artemisa, Oscar, and Ana. Because Carlos led the conspiracy, his testimony helped the government tremendously. He described the scope of the conspiracy, explained the roles played by each defendant, and interpreted scores of recorded phone calls for the jury.

The jury ultimately found all five defendants guilty on the conspiracy count. The jury found Sergio, Jaime, and the Galvans guilty of at least one count of using a telephone while committing the conspiracy, in violation of 21 U.S.C. § 843(b) and (d). The jury also convicted the Galvans of traveling in interstate commerce with the intent to facilitate the conspiracy, in violation of 21 U.S.C. § 1952(a)(3)(A). Finally, the jury convicted Sergio, Arnoldo, and the Galvans of at least one count each of knowingly and intentionally distributing and possessing

with intent to distribute cocaine, or aiding and abetting that offense, in violation of 21 U.S.C. § 841(a)(1) and (a)(2).

At sentencing, the district court found that at least 150 kilograms of cocaine were attributable to each defendant for the conspiracy count. This produced a base offense level of 38. *See* U.S.S.G. § 2D1.1(a)(3). As to Sergio, the district court added a three-level upward adjustment for being an organizer or leader, *see* U.S.S.G. § 3B1.1(b), then departed downward two levels under § 5K2.0. These departures produced an offense level of 39, which coupled with a criminal history category of I led to a Guidelines range of 262–327 months' imprisonment for the conspiracy conviction. The district court sentenced Sergio to 274 months.[2]

The district court did not increase or decrease the base offense level of 38 for Arnoldo. With his criminal history category of I, this produced a Guidelines range of 235–293 months' imprisonment. The district court sentenced Arnoldo to 235 months.

The district court similarly applied an offense level of 38 to Jaime. He had a criminal history category of III, however, which produced a Guidelines sentence of 292–365 months. He was sentenced to 292 months.

---

[2]The conspiracy count carried the highest sentence. The defendants were given lesser sentences on the other counts, to be served concurrently with the sentence for conspiracy. Thus, only the district court's determination of the conspiracy sentence is argued on appeal.

After they received downward adjustments for their minor roles in the conspiracy, *see* U.S.S.G. § 3B1.2, both of the Galvans' offense levels were 32. *See* U.S.S.G. § 2D1.1(c)(1). Both were in criminal history category I, which produced a Guidelines sentence of 121–151 months. Both were sentenced to 121 months.

## II. DISCUSSION

A.    Motion to Suppress Evidence Obtained Through Wiretaps (Sergio Zapata-Hernandez and Jaime Zapata)

Sergio and Jaime challenge the district court's refusal to suppress evidence obtained through the wiretaps, contending that the government had not demonstrated that the wiretaps were necessary. "We review for an abuse of discretion a district court's determination that a wiretap was necessary." *United States v. Ramirez-Encarnacion*, 291 F.3d 1219, 1222 (10th Cir. 2002).

Each wiretap application must include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). This rule is known as the "necessity" requirement. *See United States v. Mondragon*, 52 F.3d 291, 293 (10th Cir. 1995). In addition, the district judge issuing the wiretap order must find that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(c). "Normal"

investigative procedures include standard visual and aural surveillance, questioning witnesses and participants in the crime (including through the use of grand juries), search warrants, and infiltration of criminal enterprises by undercover agents or confidential informants. *United States v. Killingsworth*, 117 F.3d 1159, 1163 (10th Cir. 1997). The purpose of the necessity requirement is to ensure that wiretapping, which is relatively intrusive compared with other investigative methods, is not used in situations where traditional investigative techniques would be sufficient to expose the criminal activity. *United States v. Edwards*, 69 F.3d 419, 429 (10th Cir. 1995). Evidence obtained through a wiretap order that does not meet the necessity requirement must be suppressed. 18 U.S.C. § 2518(10)(a).

The government is not required, as part of the necessity showing under § 2518, "to exhaust all other conceivable investigative procedures before resorting to wiretapping." *Edwards*, 69 F.3d at 429 (quotations omitted). Thus, in examining necessity challenges to wiretap orders, we have upheld the order where:

> (1) several investigatory methods had been utilized prior to resort to wiretapping; (2) normal investigative techniques had been frustrated by various problems local police were unable to overcome; (3) increased visual surveillance would have increased the possibility of detection; and (4) potential witnesses were unwilling to testify in court because of fear of reprisal.

*Id.* at 429–30 (quotations and internal citations omitted).

In this case, the government applied for and obtained orders authorizing seven wiretaps over the course of its investigation: (1) on a number for a cell phone allegedly in Carlos's possession; (2) on a number for a cell phone allegedly in Fabian's possession; (3) on a number for a cell phone to which Fabian had allegedly switched; (4) on another number for a cell phone allegedly in Carlos's possession; and (5) on three numbers for push-to-talk cell phones allegedly subscribed to by Arnoldo. Each of the applications for the orders included an affidavit in support of the application. The affidavits are detailed and extensive; some are more than sixty pages long.

The first affidavit, attested to by DEA Agent Michael Moore, was submitted in support of the first two wiretap applications. In that affidavit, Agent Moore explained that the goals of the investigation were identifying the organization's source of drugs, learning the organization's practices and techniques, and identifying fully all of the participants in the alleged conspiracy. He also stated why traditional law enforcement techniques had failed, had met with limited success, reasonably appeared unlikely to succeed, or were too dangerous. As to the use of confidential informants, for example, he stated that Carlos had demonstrated a reluctance to do business with unknown persons and that the organization consisted of "close knit family members who tend to deal amongst themselves." Agent Moore did not know of any sources who might infiltrate the organization. Similarly, witness interviews had provided little

information about the extent and practices of the conspiracy. Agent Moore further stated that using grand jury subpoenas would not be useful, as witnesses likely would invoke their right to remain silent unless provided with immunity; this, explained Agent Moore, would undermine the investigation because it would require immunization of the conspiracy's most culpable members.

Surveillance had also not succeeded in exposing the parameters of the conspiracy. Agent Moore stated that members of the organization were "extremely surveillance conscious" and lived in affluent neighborhoods where surveillance was usually not possible without alerting the suspicions of residents and members of the organization. Agent Moore added that the government had decided against seeking search warrants for the homes of Carlos and Sergio. According to Agent Moore, the government had only limited knowledge of what evidence might be found in the homes. The government also believed that Carlos and Sergio were not likely to keep evidence in their homes for long periods of time. Thus, a search warrant would likely be executed at a time when drugs and other evidence would not be present, which would only alert the organization to the government's investigation.

Agent Moore stated that the use of pen registers and toll records had not helped to identify the extent and operation of the organization. Six confiscations of trash had produced no useful evidence. An examination of public records had provided useful corroboration of informants' statements but had yielded no

-12-

information regarding the overall objectives of the investigation.

Either Agent Moore or DEA Agent Michael Tonozzi attested to the affidavits in support of additional wiretaps. Those affidavits incorporated by reference the statements regarding the necessity of the wiretaps contained in Agent Moore's first affidavit. The affidavits also included additional statements relevant to the necessity requirement. For example, in his affidavit in support of the third wiretap, Agent Tonozzi stated that members of the organization said they were "laying low" and scared to continue with business because of the threat of police investigation. Thus, because members of the organization were reducing or more thoroughly concealing their activities, Agent Tonozzi explained that extensive surveillance and search warrants were unlikely to produce information about the extent of the organization.

Sergio and Jaime argue that the affidavits did not demonstrate necessity and that other less intrusive techniques would have—and indeed did—suffice in this case. Specifically, they contend that traditional investigative techniques had produced sufficient information regarding their involvement in the conspiracy for the government to arrest and prosecute them individually. The government claims that traditional law enforcement methods did not succeed in achieving the goals of the investigation, which included identifying all members of the conspiracy and uncovering how the conspiracy operated. The government asserts that the objective of the investigation was not simply to arrest individual members

of the conspiracy, such as Sergio and Jaime. The goal was to gather information and admissible evidence about the entire organization, including the suppliers, distributers, importers, and transporters. The government states that the affidavits showed how traditional tools proved ineffective in pursuit of that objective.

We agree with the government's characterization of the affidavits. As the district court explained:

> From the affidavits it is clear that the DEA employed traditional investigative techniques with limited success; that the Zapata-Hernandez organization was insular, sophisticated, complex, and multi-faceted; that members of the organization adeptly detected and evaded surveilling officers; and that the Government did not know until some time after [the last wiretap authorization had been ordered] the full extent of the organization or the location where drugs might be found during execution of a search warrant.

Thus, we conclude that the government explained sufficiently why the wiretaps were necessary. *See United States v. Johnson*, 645 F.2d 865, 867 (10th Cir. 1981) ("the determination of the dimensions of an extensive drug conspiracy [has] been held to justify the use of electronic surveillance."); *see also United States v. Newman*, 733 F.2d 1395, 1399 (10th Cir. 1984) (citing *Johnson* to hold that an affidavit in support of a wiretap application satisfied the necessity requirement where the prior investigation into a drug conspiracy had failed to reveal the source of the drugs and the extent of the conspiracy).

Indeed, we upheld a series of wiretaps under similar circumstances. In *Ramirez-Encarnacion*, the DEA was investigating a smuggling operation that

brought drugs from Mexico to Colorado. *Ramirez-Encarnacion*, 291 F.3d at 1221. The district court judge authorized a wiretap on a dairy that was believed to be the operational center, and authorized interceptions from the defendant's home. *Id.*

In upholding the wiretaps, we noted that the location of the dairy made surveillance "almost impossible"; that the "tight-knit nature of the conspiracy" precluded undercover infiltration; that "search warrants would have been counterproductive" because they would have alerted the conspirators to the investigation; and that despite the use of pen registers, "the identity of many of the conspirators and the full extent of the conspiracy remained unknown." *Id.* at 1223.

All of the factors cited in *Ramirez-Encarnacion* are present in this case. According to the DEA agents, surveillance would only have aroused suspicions; the conspiracy included "close-knit family members," making infiltration difficult; search warrants would have been ineffective and possibly damaging to the investigation; and the government's motivation in using the wiretaps was to gain insight into the full extent of the conspiracy. Based on that precedent, as well as ample evidence supporting the necessity of the wiretaps, we hold that the district court did not abuse its discretion in authorizing the wiretaps.

B.     Sufficiency of the Evidence (Jaime Zapata)

"Whether the government presented sufficient evidence to support a

conviction is a legal question" that we review de novo. *United States v. Hernandez*, 509 F.3d 1290, 1295 (10th Cir. 2007). In considering a sufficiency-of-the-evidence challenge, we view the record in the light most favorable to the government to determine whether a reasonable jury could find the defendant guilty beyond a reasonable doubt. *Id.* We do not weigh conflicting evidence or make credibility determinations, as these are exclusively functions of the jury. *See United States v. Bowen*, 527 F.3d 1065, 1076 (10th Cir. 2008).

Jaime claims that his conviction should be overturned because it resulted from the jury "piling inference upon inference." *See United States v. Jones*, 44 F.3d 860, 865 (10th Cir. 1995). Jaime also notes that a conviction must be based on more than "a mere suspicion of guilt." *United States v. Dunmire*, 403 F.3d 722, 724 (10th Cir. 2005). His conviction, however, was based neither on suspicion nor on the piling of inferences. Jaime's conviction was based on direct testimony from his co-conspirators, and the evidence was more than sufficient for a reasonable jury to convict him on the conspiracy and possession counts.

Carlos testified that Jaime was an owner or investor in the distribution scheme. Carlos explained that when he traveled to Mexico to buy cocaine from Primo, Jaime usually gave Carlos money for one-to-two kilograms of cocaine for himself. When the cocaine reached Denver, Jaime would pick up his share of the shipment and sell the cocaine to his customers.

Fabian also testified as to Jaime's involvement in the conspiracy. He

-16-

similarly described Jaime as an owner in the enterprise. During Fabian's testimony, the jury also heard recorded phone conversations between the two men during which Jaime asked Fabian whether he "picked up the stuff" from Lilian and discussed payment arrangements for family members who were driving the cocaine from El Paso to Denver. The jury heard further evidence "regarding frequent drug transactions among the defendants and their coconspirators, as well as testimony regarding the defendants' attendance at and sometimes participation in drug-related discussions," which shows that Jaime knew "of the general nature and scope of the illegal enterprise" and shared its distribution objective. *See United States v. Evans*, 970 F.2d 663, 673 (10th Cir. 1992). Thus, contrary to Jaime's argument that the jury convicted him by impermissibly "piling inference on inference," the testimony from Carlos and Fabian is sufficient to support his conviction.

C.    Jury Instructions (Sergio Zapata-Hernandez, Humberto and Lilian Galvan)

Sergio and the Galvans challenge Jury Instruction No. 13, arguing that it impermissibly allowed the jury to find them guilty of conspiracy based on the conduct and knowledge of co-defendants rather than of themselves.[3] The relevant portion of instruction No. 13 states:

In this case each of the defendants is charged with being a member of

_____

[3]Both Galvans also challenge the use of the phrase "a defendant" in jury instructions No. 14 and 15. All of the challenges to the instructions present the same issues, so they will be considered together.

a conspiracy to distribute and to possess with intent to distribute five kilograms or more of a substance and mixture containing a detectable amount of cocaine.

To find <u>a defendant</u> guilty of this crime you must be convinced that the government has proved each of the following elements beyond a reasonable doubt:

First, on or about between May 1, 2002 and August 31, 2004 two or more persons knowingly agreed to distribute or to possess with intent to distribute cocaine in violation of the law.

Second, <u>a defendant</u> knew the essential objective of the conspiracy.

Third, <u>a defendant</u> knowingly and voluntarily involved himself or herself in the conspiracy.

Fourth, there was interdependence among the members of the conspiracy; that is, the members in some way or manner intended to act together for their shared mutual benefit within the scope of the conspiracy charged.

And fifth, on or about between May 1, 2002 and August 31, 2004 the overall scope of the conspiracy involved five kilograms or more of a substance containing a detectable amount of cocaine. (Emphasis added).

Sergio and the Galvans contend that use of the term "a defendant," as opposed to "the defendant," misled the jury by suggesting that the conduct of a separate co-defendant could be used to prove the material elements of the conspiracy charge against them. For example, the argument goes, the instruction could have permitted the jury to convict Sergio if the jury found that another co-defendant, but not Sergio himself, knew the essential objective of the conspiracy and knowingly and voluntarily involved himself in the conspiracy.

-18-

The instruction was formulated by the district court at the final jury instruction conference. The district court specifically asked the defendants and the government whether they objected to use of the term "a defendant" rather than "the defendant." There were no objections. Therefore, we review for plain error. *See United States v. Teague*, 443 F.3d 1310, 1314 (10th Cir. 2006).

The defendants argue that counsel for Mr. Galvan objected to the instruction by submitting his own proposed jury instructions to the district court prior to the instruction conference, and that this objection preserved the issue on appeal for them all. In *United States v. Ray*, however, we held that an objection by one defendant is not sufficient to preserve the issue for appeal for another defendant, at least when (as is the case here) there is no agreement among the defendants that an objection by one defendant will count as an objection by all defendants. *United States v. Ray*, 370 F.3d 1039, 1043–44 & n.3 (10th Cir. 2005), *vacated on other grounds*, 543 U.S. 1109 (2005).[4]

In addition, Mr. Galvan's objection was not sufficient to preserve the issue even as to his own appeal. Rule 30 of the Federal Rules of Criminal Procedure requires that "[a] party who objects to any portion of the instructions or to a failure to give a requested instruction *must inform the court of the specific*

[4]The defendants ask us to reconsider our holding in *Ray*. We cannot, however, overturn a prior decision "barring en banc reconsideration, a superseding contrary Supreme Court decision, or authorization of all currently active judges on the court." *United States v. Edward J.*, 224 F.3d 1216, 1220 (10th Cir. 2000).

*objection and the grounds for the objection. . . .* Failure to object in accordance

with this rule precludes appellate review, except as permitted under Rule 52(b)

[regarding plain error]." Fed. R. Crim. P. 30(d) (emphasis added). Thus, we have

held that a generalized objection to an instruction is insufficient to preserve a

specific objection on appeal. *See United States v. Bornfield*, 184 F.3d 1144, 1146

n.2 (10th Cir. 1999).

In his four-page proposed jury instructions and verdict form, Mr. Galvan

simply asked the district court to use the Tenth Circuit's pattern jury instructions

rather than the instructions proposed by the government. Pattern Jury Instruction

No. 2.87, which lists the elements of conspiracy, uses the phrase "the defendant."

But Mr. Galvan did not make this particular point in his filing with the district

court, stating only that using the pattern instructions "is more appropriate." Mr.

Galvan's entire argument for using the pattern instructions was as follows:

> [T]he Defendant contends that it is more appropriate to rely on the
> Jury Instructions published by the United States Court of Appeals for
> the Tenth Circuit. These Criminal Pattern Jury Instructions [are]
> readily available at the Tenth Circuits [sic] website:
> http://www.ca10.uscourts.gov/.
>
> . . . [U]nless not otherwise provided for by the Tenth Circuit and to
> the degree that the proposed jury instructions requested by the
> government are different from Criminal Pattern Jury Instructions
> provided for by the United States Court of Appeals for the Tenth
> Circuit, the Defendant requests that the Jury Instructions provided by
> the United States Court of Appeals for the Tenth Circuit prevail and
> be utilized for the instant case. (Emphasis in original).

This generalized objection to the use of instructions other than the Criminal

Pattern Jury Instructions is not sufficient to preserve the specific argument Mr. Galvan raises on appeal. Therefore, the court's alleged error in giving Instruction No. 13 will be reviewed only for plain error.

"Plain error occurs when there is (1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Price*, 265 F.3d 1097, 1107 (10th Cir. 2001). We need not assess the propriety of the instruction, because neither Sergio nor the Galvans have shown that the instruction affected their substantial rights. An error affects a defendant's substantial rights if it is prejudicial; that is, if it affected the outcome of the proceedings in the district court. *United States v. Olano*, 507 U.S. 725, 734 (1993). The defendant bears the burden to demonstrate prejudice. *Id.*

Here, the Galvans argue that they were only alleged to have played a minor role in the charged conspiracy, and that the use of "a defendant" rather than "the defendant" in the instruction "could seriously have misled the jury by suggesting that conduct committed by a separate co-defendant . . . could have been used to prove the material elements of the conspiracy charge against Mr. or Mrs. Galvan." This unsupported statement, without more, is not enough to show that jurors did, in fact, consider evidence relating only to the Galvans' co-defendants in determining their guilt. Moreover, there was extensive evidence at trial establishing the Galvans' involvement in the conspiracy. Sergio's argument

regarding the effect of the challenged instruction was similarly speculative, and the evidence against him was similarly sufficient. Therefore, the defendants challenging the instructions have not met their burden to demonstrate prejudice.

D.      Severance (Jaime Zapata, Humberto Galvan, Lilian Galvan)

Multiple defendants may be tried together "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b). If, however, a joint trial "appears to prejudice a defendant, . . . the court *may* order separate trials of counts [or] sever the defendants' trials." Fed. R. Crim. P. 14(a) (emphasis added). Joint trials of defendants who are charged together are preferred because "they promote efficiency and serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." *United States v. Hall*, 473 F.3d 1295, 1301 (10th Cir. 2007) (quotation omitted). In particular, "[t]he preference in a conspiracy trial is that persons charged together should be tried together." *United States v. Small*, 423 F.3d 1164, 1181 (10th Cir. 2005). Severance is discretionary and should be granted only when "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Hall*, 473 F.3d at 1302 (quotation omitted).

The standard for reviewing a district court's denial of a motion to sever is abuse of discretion. *United States v. Windrix*, 405 F.3d 1146, 1155 (10th Cir.

2005). Jaime argues that the district court abused its discretion in not severing his trial because the varying levels of involvement among the defendants, as well as the amount of testimony that did not implicate Jaime himself, rendered the jury incapable of evaluating the evidence independently as to him. As a variation on this argument, Jaime contends that he was convicted based on "spill over" evidence—that is, evidence that was relevant only to his co-defendants. We have repeatedly held, however, that the requisite showing of prejudice "is not made by a complaint that one defendant is less culpable than another, or by an allegation that a defendant would have a better chance of acquittal in a separate trial, or by a complaint of the 'spill-over' effect of damaging evidence presented against a codefendant." *United States v. Iiland*, 254 F.3d 1264, 1270 (10th Cir. 2001) (internal citations omitted). Rather, a defendant must show that he was deprived of his right to a fair trial. *United States v. Pack*, 773 F.2d 261, 267 (10th Cir. 1985).

Jaime was not deprived of a fair trial. The facts of this case were not so intricate or complex as to render the jury unable to segregate the evidence associated with each defendant's individual actions. Moreover, the district court gave the jury a cautionary instruction that limited any possible risk of prejudice. Instruction 10, which was taken verbatim from the Tenth Circuit Pattern Criminal Jury Instructions, stated:

A separate crime is charged against one or more of the defendants in

-23-

each count of the indictment. You must separately consider the evidence against each defendant on each count and return a separate verdict for each defendant. Your verdict as to any one defendant or count, whether it is guilty or not guilty, should not influence your verdict as to any other defendants or counts.

Finally, there was clear and direct testimony at trial that specifically implicated Jaime in the conspiracy. Based on that evidence, we cannot say that Jaime was denied a fair trial due to the risk of prejudicial spillover. The district court did not abuse its discretion in denying his motion for severance.

The Galvans essentially take the same position as Jaime, but they further argue that the limiting instruction is ambiguous and could have been interpreted by jurors to mean that evidence of another defendant's illegal conduct could be used against the Galvans to establish the elements of the crime charged against each of them. We disagree. The instruction is not ambiguous; it clearly instructs the jury to consider the evidence separately for each defendant and that one defendant's guilt must not be imported to any other defendant. In addition, as we explained previously, there was overwhelming evidence at trial establishing the Galvans' involvement in the conspiracy.

E.    Sentencing (Sergio Zapata-Hernandez, Arnoldo Zapata, Jaime Zapata, Humberto Galvan, Lilian Galvan)

"We review sentences for reasonableness under a deferential abuse of discretion standard." *United States v. Haley*, 529 F.3d 1308, 1311 (10th Cir. 2008). Reasonableness review has two components: procedural reasonableness

-24-

and substantive reasonableness. *Id.* "A sentence is procedurally unreasonable if the district court incorrectly calculates or fails to calculate the Guidelines sentence, treats the Guidelines as mandatory, fails to consider the § 3553(a) factors, relies on clearly erroneous facts, or inadequately explains the sentence." *Id.* A sentence is substantively unreasonable if its length is unreasonable in light of the sentencing factors set forth in § 3553(a). *Id.*

1. *Procedural Challenges*

Both Arnoldo and Jaime challenge their sentences on procedural grounds, contending that the district court erroneously attributed 150 kilograms of cocaine to them in determining their offense level. The district court's determination of drug quantity is a factual finding that must be supported by a preponderance of the evidence and is reviewed for clear error. *United States v. Hernandez*, 509 F.3d 1290, 1298 (10th Cir. 2007). To be clearly erroneous, the finding must be "simply not plausible or permissible in light of the entire record on appeal." *United States v. Morales*, 108 F.3d 1213, 1225 (10th Cir. 1997).

U.S.S.G. § 1B1.3(a), which deals with relevant conduct, provides that a defendant's sentence shall be determined based on:

> (1)(A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and
> (B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of

-25-

the jointly undertaken criminal activity[.]

Thus, "[i]n a controlled substances case, a defendant is 'accountable for all quantities of contraband with which he was directly involved and, in the case of a jointly undertaken criminal activity, all reasonably foreseeable quantities of contraband that were within the scope of the criminal activity that he jointly undertook.'" *United States v. Lauder*, 409 F.3d 1254, 1267 (10th Cir. 2005) (quoting U.S.S.G. § 1B1.3 cmt. n.2).

In this case, the district court recalled Carlos's testimony that there were seven investors in the conspiracy—Carlos, Sergio, Jaime, Arnoldo, Jose Alfredo, Fabian Miranda-Urbina, and Efrain Venzor.[5] The court then began calculating drug quantities beginning in December 2003, a conservative starting point based on Carlos's testimony that the investors were all in on the scheme no later than then. The court stated that the testimony from the drug transporters themselves, as well as from other evidence at trial, demonstrated that from December 2003 until the end of the conspiracy in August 2004, Artemisa had transported twenty-four kilograms, the Galvans had transported twenty-four kilograms, Ana had

[5]At one point, the district court referred only to Carlos, Sergio, Arnoldo, Jose Alfredo, Fabian, and Efrain as investors—thus leaving out Jaime. On appeal, Jaime argues that this "ambiguity" renders the 150-kilogram calculation erroneous as to him. We disagree. The totality of the evidence at trial, the district court's statements at sentencing, and statements from counsel for Jaime all demonstrate that the court considered Jaime an owner in the operation. Moreover, the district court's sentencing report twice refers to Jaime's specific investments, which leads us to conclude that his omission from the aforementioned list was merely an oversight.

transported twenty-seven kilograms, Ramon had transported twenty-five-to-thirty-kilograms, Alberto Cabral had transported twenty-four kilograms, Daniel Talavera had transported at least nine kilograms, one of Mr. Mejia's smugglers had transported twenty-one kilograms, and Mr. Mejia had transported twelve kilograms. Thus, the court "conservatively" calculated that between 155 and 175 kilograms were transported between December 2003 and August 2004.

The court then found that this quantity was reasonably foreseeable as to all defendants based on the close familial relationship among the co-conspirators and the efficiency of the drug operation. Indeed, the court found this fact "beyond a reasonable doubt," explaining that "it defies credulity to say that these close family members who had a financial stake in this cocaine were unaware, particularly in light of the wiretap evidence, . . . of the scope and nature of the conduct of all of the co-conspirators."

The record adequately supports the district court's finding. We are not persuaded that Sergio and Jaime were not members of the conspiracy, and therefore could not have drug quantities attributed to them, until April 2004. As the district court recalled, Carlos testified that Sergio and Jaime were in on the scheme no later than December 2003. Because the district court found that the conspiracy involved more than 150 kilograms of cocaine from that point forward,

the court did not err in assigning that amount to Sergio and Jaime.[6]

2.      *Substantive Challenges*

All five sentences are within the applicable Guidelines range and hence are entitled to a presumption of reasonableness on appeal.  *See United States v. Kristl*, 437 F.3d 1050, 1054 (10th Cir. 2006).  The defendants attempt to rebut this presumption by arguing that their sentences are unjustifiably long compared with the shorter sentence that the more culpable Carlos received.  *See* 18 U.S.C. § 3553(a)(6) (stating that one sentencing factor is "the need to avoid unwarranted

---

[6]The district court's finding that Jaime was a member of the conspiracy no later than December 2003 also forecloses his argument that his criminal history category should have been II rather than III.  The district court added one criminal history point for a 1994 breach of the peace conviction, *see* U.S.S.G. § 4A1.1(c), § 4A1.2(e)(2); two points for a January 2001 drug conviction, *see* § 4A1.1(b), § 4A1.2(e)(2); two points because Jaime was on probation for the drug conviction when he committed the conspiracy offense, *see* § 4A1.1(d); and one point because he was released from custody for the drug conviction in January 2002, less than two years before he committed the conspiracy offense, *see* § 4A1.1(e).  This resulted in six criminal history points, which placed Jaime in Criminal History Category III.

Jaime objects to the addition of points under § 4A1.1(d), contending that his probation ended in July 2003 and there was no evidence he had joined the conspiracy at that time.  Even assuming this to be the case, Jaime would still have five criminal history points and thus remain in Category III.  Specifically, he would still have one point for the breach of the peace conviction under § 4A1.1(c) and two points for the drug conviction under § 4A1.1(b).  He would not have any points under § 4A1.1(d) for committing the instant offense while on probation.  But because § 4A1.1(d) no longer applies, however, Jaime would now pick up two points—rather than only one point—under § 4A1.1(e) for committing the instant offense less than two years from being released from custody on the prior drug conviction.  *See* § 4A1.1(e).  This totals five criminal history points, which results in placement in Category III.

sentence disparities among defendants with similar records who have been found guilty of similar conduct").

This argument is insufficient to rebut the presumption of reasonableness. A district court may consider sentencing disparities between co-defendants, *United States v. Smart*, 518 F.3d 800, 810 (10th Cir. 2008), but the purpose of the Guidelines is not to eliminate disparities among co-defendants, but rather to eliminate disparities among sentences nationwide. *United States v. Gallegos*, 129 F.3d 1140, 1143 (10th Cir. 1997). In addition, "disparate sentences are allowed where the disparity is explicable by the facts on the record." *United States v. Davis*, 437 F.3d 989, 997 (10th Cir. 2006) (internal quotations omitted).

We have specifically stated that a "decision to accept responsibility and assist the government does not create an unwarranted disparity under § 3553(a)(6)." *United States v. Haley*, 529 F.3d 1308, 1312 (10th Cir. 2008).[7] We have also stated that a disparity among co-defendants is justified "when sentences are dissimilar because of a plea bargain." *Gallegos*, 129 F.3d at 1144. Here, the disparity is explainable because Carlos pleaded guilty and cooperated with the government by testifying extensively at trial. The appealing defendants did not cooperate and took their cases to trial. Therefore, we conclude that the defendants' within-Guidelines sentences are reasonable.

---

[7]Jaime's criminal history placed him in Category III, which further explains the disparity between his sentence and that of Carlos, who was in Category I.

## III.  CONCLUSION

For the foregoing reasons, we AFFIRM.