**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**November 14, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

ANTHONY JUAN ARMENTA,

    Defendant - Appellant.

No. 23-7035
(D.C. No. 6:21-CR-00208-PRW-2)
(E.D. Okla.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **MATHESON**, **KELLY**, and **MORITZ**, Circuit Judges.
_____

A jury convicted Anthony Armenta of several crimes stemming from a

shooting and physical altercation. He challenges his convictions on the basis that he

did not receive a fair trial or due process because the district court refused to sever

his trial from that of his codefendant. Although we agree with Armenta that he and

his codefendant presented mutually antagonistic defenses at least in part, Armenta

fails to demonstrate any prejudice flowing from that antagonism. And even if he

could show prejudice, he cannot establish that the district court abused its discretion

in issuing limiting instructions rather than severing his trial. So we conclude that the

---

[*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel. But it may be cited for its
persuasive value. _See_ Fed. R. App. P. 32.1(a); 10th Cir. R. 32.1(A).

district court did not abuse its discretion in denying the motion to sever and affirm.

## Background

Armenta's convictions stem from an incident that took place on the banks of the Mountain Fork River in May 2020 when a group of three friends returning from a fishing trip encountered two strangers on the shore. That encounter would end with shots fired and criminal charges filed against Armenta and his codefendant, Kevin Ward.

According to trial testimony from victims Braydon Rich, Trent Short, and Christopher Chappell, they had been fishing for a couple hours when they spotted a storm rolling in and decided to head back to shore. As their boat neared the bank, located on the Choctaw Nation Reservation, Rich exited the boat and walked up the bank, intending to drive a vehicle down to the bank to pull the boat out of the river. Armenta approached Rich and asked if he had jumper cables. When Rich replied in the negative, Armenta pulled out a gun, pointed it at him, and told him not to move. Rich ran to Chappell's truck, jumped inside, and called 911. As Rich watched, a second man, Ward, hit the truck's windshield with a gun and yelled at him to get out.

While Rich took refuge in the truck, Short and Chappell remained in the boat. Chappell heard Armenta tell Ward to "just pop him," referring to Rich, and Ward fired at the truck. R. vol. 4, 290. Armenta then started shooting at Chappell and Short. Two bullets struck Short, but he and Chappell were able to swim to safety. Armenta and Ward then pulled Rich out of the truck, and a fight ensued. Armenta and Ward hit Rich multiple times, including with a tire tool, a gun, and a pipe. Rich

2

was eventually able to break away and run to a friend's house.

Based on these events, the government indicted Armenta and Ward on four counts: assault resulting in serious bodily injury in Indian Country (as to Short), two counts of assault with a dangerous weapon with intent to do bodily harm in Indian Country (as to Chappell and Rich), and one count of using, carrying, brandishing, and discharging a firearm during and in relation to a crime of violence. The indictment charged both men with each count both directly and on a theory of aiding and abetting.

Armenta sought to sever the case against him from the case against Ward at least six times. At the outset, in a pretrial motion, he cited statements Ward made to investigators that implicated and placed blame on Armenta for firing at the boat, asserting that those statements would be admissible against Ward in a joint trial but would not be admissible in a separate trial against only Armenta. The district court refused to sever, ruling that Armenta failed to show mutually antagonistic defenses or a prejudicial risk to a specific trial right. The court noted that the government intended to redact Armenta's name from Ward's confession and that the court would provide a limiting instruction advising the jury to consider the confession only as evidence of Ward's guilt.

Armenta moved to sever a second time, after jury selection but before opening statements, when it became clear that Ward might introduce evidence of Armenta's prior drug use as part of a duress defense. But the district court again denied the motion, stating that judicial economy favored joinder and reiterating that the defenses

3

were not mutually exclusive and that no specific trial right was jeopardized.

Ward's duress defense crystallized during trial. Ward testified that he smoked marijuana and methamphetamine with Armenta on the day of the shooting and that Armenta was "real paranoid" and "crazy." *Id.* at 684. He explained that Armenta believed a friend of his was in danger and that Armenta threatened to kill Ward and Ward's girlfriend if Ward did not stay in the car while Armenta drove around looking for the friend. This threat seemed credible, Ward said, because Armenta's girlfriend had burn marks on her body, and Armenta implied that he inflicted them. Ward testified that Armenta handed him a gun when they arrived at the river, then pointed his own weapon at him and told him to shoot at Rich in the truck. He also said that he received threatening letters from Armenta while in jail. To corroborate this testimony, Ward called the lead detective on the case, who testified that he learned Armenta had been awake for 20 days leading up to the shooting and had threatened to blow up a bridge and kill people.[1] He also called the mother of Armenta's girlfriend, who said she saw the burns on her daughter's body.

Armenta not only objected to much of this testimony but also repeatedly renewed his motion to sever, arguing that the government would not have been able to bring in any of this evidence had he been tried alone. And because this evidence was introduced by a codefendant and not the government, Armenta pointed out, he

---

[1] The district court admitted the detective's testimony for the limited purpose of corroborating Ward's state of mind, not for its truth, and instructed the jury to that effect.

had not received notice pursuant to Federal Rule of Evidence 404(b) that evidence of prior bad acts would be introduced. As a result, he contended, he was unable to investigate the veracity of the allegations. But the district court consistently denied Armenta's motions, reiterating its view that the defenses were not mutually antagonistic, that Armenta failed to point to a specific compromised trial right, and that judicial economy favored proceeding jointly.[2]

Armenta's defense theory, according to his opening statement, was that he merely fired his gun in the air after hearing other shots fired, that Ward alone shot at all three victims, and that although Armenta hit Rich with a gun during their physical altercation by the truck, he did so only in self-defense. But Armenta rested without calling any witnesses in support of this theory.[3] And the government, for its part, argued in closing that Ward and Armenta were "equally responsible" for each other's assaults on an aiding-and-abetting theory. *Id.* at 752.

The instructions to the jury included both an aiding-and-abetting instruction

---

[2] The district court also denied Armenta's two mistrial motions, which asserted undue prejudice from the detective's testimony about Armenta's drug use and mental state and from Ward's testimony about the burns on Armenta's girlfriend. The district court stated that "[t]he government could introduce all this in a separate trial" and that "Armenta's problem in this case is the lack of evidence to support his theory of defense, not his misfortune of trial together with his co[]defendant." R. vol. 4, 581, 747.

[3] Instead, Armenta attempted to develop his theory through cross-examination. For example, Armenta elicited from Rich that Rich also hit Armenta, who never pointed a gun at him. He elicited from a detective that no bullets were recovered near the banks of the river and from a firearms examiner that ballistic testing was inconclusive. He also tried to impeach the victims' perceptions of the incident, such as by suggesting that Chappell could not hear what Armenta said to Ward about shooting Rich.

for each count as well as an instruction that certain evidence was introduced for a limited purpose. But the district court rejected Armenta's request to specifically instruct the jury that evidence of Ward's state of mind could not be used against Armenta. The jury convicted Armenta and Ward on all counts. The district court sentenced Armenta to a total of 240 months in prison and three years of supervised release.[4]

Armenta appeals.

## Analysis

Armenta argues that the district court's refusal to sever his trial from Ward's violated his rights to due process and a fair trial. We review the court's refusal to sever for abuse of discretion. *United States v. Jones*, 530 F.3d 1292, 1300 (10th Cir. 2008). Under this deferential standard of review, we will not reverse the district court's ruling "absent an affirmative showing of abuse of discretion and a strong showing of prejudice." *Id.* (quoting *United States v. Stiger*, 413 F.3d 1185, 1197 (10th Cir. 2005)); *see also United States v. Swingler*, 758 F.2d 477, 493 (10th Cir. 1985) (explaining that reversal is "rarely" warranted in this context).

Federal Rule of Criminal Procedure 8(b) allows for joinder of criminal

---

[4] The district court sentenced Ward to 180 months in prison and three years of supervised release. In his appeal, which is currently pending before this court, Ward argues that he was arrested without probable cause and that the district court erroneously allowed the government and Armenta to cross-examine him about his post-arrest silence, wrongly excluded evidence corroborative of his duress defense, and erroneously instructed the jury on duress. Appellant's Opening Brief at 24–27, *United States v. Ward*, No. 23-7088 (10th Cir. May 28, 2024). He additionally argues for cumulative error and challenges his sentence. *Id.*

defendants when "they are alleged to have participated in the same act or transaction . . . constituting an offense or offenses." And we generally "prefer district courts to conduct joint trials of defendants who are charged together." *United States v. Herrera*, 51 F.4th 1226, 1264 (10th Cir. 2022). But "[a]n exception exists when a party shows actual prejudice outweighing the expense and inconvenience of separate trials." *Id.*; *see also* Fed. R. Crim. P. 14(a) (allowing severance of defendants' trials if joinder "appears to prejudice a defendant"). Actual prejudice in this context requires the defendant to "show the right to a fair trial is threatened or actually impaired." *United States v. Thomas*, 849 F.3d 906, 911–12 (10th Cir. 2017). It is not enough to merely "point[] to a 'negative spill[]over effect from damaging evidence presented against codefendants.'" *United States v. Caldwell*, 560 F.3d 1214, 1221 (10th Cir. 2009) (quoting *United States v. Wacker*, 72 F.3d 1453, 1468 (10th Cir. 1995)).

In *United States v. Pursley*, we outlined a three-step framework for district courts to use when deciding severance motions. 474 F.3d 757, 765 (10th Cir. 2007). First, the court "must determine whether the defenses presented are 'so antagonistic that they are mutually exclusive.'" *Id.* (quoting *United States v. Peveto*, 881 F.2d 844, 857 (10th Cir. 1989)). "Second, because '[m]utually antagonistic defenses are not prejudicial per se,' a defendant must further show 'a serious risk that a joint trial would compromise a specific trial right . . . or prevent the jury from making a reliable judgment about guilt or innocence.'" *Id.* (alteration and omission in original) (quoting *Zafiro v. United States*, 506 U.S. 534, 539 (1993)). And third, if the first two steps are satisfied, "the trial court exercises its discretion and 'weigh[s] the prejudice

7

to a particular defendant caused by joinder against the obviously important considerations of economy and expedition in judicial administration.'" *Id.* (alteration in original) (quoting *Peveto*, 881 F.2d at 857). We consider each step in turn, keeping in mind our overall deference to the district court's ruling. *See id.*

## I.　Mutually Antagonistic Defenses

Mutual antagonism requires more than a "conflict of theories or one defendant's attempt to cast blame on another." *Peveto*, 881 F.2d at 857. Rather, a "defendant must demonstrate that the acceptance of one party's defense would tend to preclude the acquittal of the other[] or that the guilt of one defendant tends to establish the innocence of the other." *Id.* Thus, we have explained that to find mutual antagonism, "[t]he essence or core of the defenses must be in conflict such that the jury, in order to believe the core of one defense, must necessarily disbelieve the core of the other." *Swingler*, 758 F.2d at 495 (quoting *United States v. Romanello*, 726 F.2d 173, 177 (5th Cir. 1984)); *see also United States v. Dirden*, 38 F.3d 1131, 1141 (10th Cir. 1994) ("The defenses truly must be mutually exclusive, such that the jury could not believe the core of one defense without discounting entirely the core of the other.").

Examples from caselaw illustrate the logical puzzles involved in this analysis. In *Peveto*, two codefendants were charged with violating and conspiring to violate drug laws based in part on their presence at a house containing various drug paraphernalia. 881 F.2d at 848. At trial, one defendant asserted that he was present at the house only because he was becoming an informant and attempting to "set up"

8

drug dealers. *Id.* at 849. To prove this theory, the defendant testified that his codefendant was one such drug dealer—and this was "the only evidence at trial of any criminal behavior on [the codefendant's] part." *Id.* at 857. The codefendant, meanwhile, maintained that he was innocent and at the house only because he was afraid of the defendant, who would not let him leave. *Id.* at 857. We pointed out that both things could not be true at the same time: either the defendant was an informant and the codefendant was a drug dealer, or the defendant was not an informant and the codefendant was an innocent bystander held against his will. *Id.* at 857–58. We therefore concluded that these defenses were so antagonistic as to be mutually exclusive. *Id.* at 858.

Similarly, in *Pursley*, we found mutual antagonism where one defendant claimed he did not assist in preparation of fraudulent tax returns and did not work at the company listed on them, while his codefendant said the opposite. 474 F.3d at 765. The defendant argued "no crime was committed *by him*," while his codefendant "maintained no crime was committed *at all*." *Id.* "A jury could not simultaneously believe" the two theories of defense. *Id.* at 766.

In contrast, we have found no mutual antagonism where a jury could conclude both defense theories were true. In *Swingler*, for example, one defendant generally disclaimed involvement in conspiracies to manufacture and distribute amphetamines, while a codefendant argued that he was involved, but only under duress from members of a violent gang. 758 F.2d at 494. Because the men were arrested together, the defendant argued that to find his codefendant was acting under duress, a jury

9

would have to conclude that the defendant threatened his codefendant and was guilty. *Id.* at 494, 496. But we held that a jury could conclude the defendant was not involved and the codefendant was under duress from another member of the gang. *Id.* at 496. Thus, neither defense "contained the sort of direct accusation that would have logically prevented the jury from accepting both theories." *Id.*

We arrived at a similar outcome in *Dirden*. There, the defendant, his codefendant, and a third person were arrested in a car where police found drugs and a gun. 38 F.3d at 1135, 1141. Both the defendant and his codefendant claimed that the contraband did not belong to them. *Id.* These defenses were not mutually antagonistic, we held, because a jury accepting the codefendant's defense "would not be compelled to reject [the defendant's] defense that the drugs and firearm were not his," particularly given that there were three people in the car. *Id.* at 1141. The ability to accept multiple theories of defense was also a deciding factor in *United States v. Linn*, 31 F.3d 987 (10th Cir. 1994). After an arson, the defendants accused each other of starting the fire, but they also presented theories at trial that it was accidental or that an unknown arsonist was involved. *Id.* at 989, 992. We held that "[t]he jury could have believed all of [d]efendants' theories and acquitted all of them, but, unfortunately for [d]efendants, did not." *Id.* at 992.

Turning to the case before us, we note as an initial matter that it is difficult to determine the exact contours of Armenta's defense because his theory was presented only in opening and closing arguments, with no independent evidence to support it. But recall that based on his opening argument, Armenta's defense as to Rich was that

he heard shots fired, so he fired his gun into the air, and that during the physical altercation with Rich, he hit him with a gun in self-defense. And recall that Ward's defense as to Rich was that Armenta pointed a gun at Ward and told him to shoot at Rich, which he did under duress based on fear created by Armenta's prior threats and alleged abuse of his girlfriend. Ward also denied pulling Rich out of the car and attacking him with Armenta.[5] As to the other two victims, Chappell and Short, Armenta said Ward shot at them. But Ward said Armenta was the one who shot at them. We consider mutual antagonism of these defenses first as to Rich and then as to Chappell and Short.

Finding Ward not guilty of the assault on Rich based on duress would require finding Armenta guilty of that assault on an aiding-and-abetting theory.[6] That is

---

[5] Another complicating factor as to Rich is that both defendants could have been convicted of assaulting him based on different acts. In its closing argument, the government said Armenta pointed a gun at Rich, told Ward to shoot Rich, and then hit Rich with a gun. The government argued Ward shot at Rich and joined Armenta in attacking Rich with a pipe or pistol.

[6] The government contends Ward's duress defense stemmed not from Armenta's guilt of the charged offenses but from Armenta's earlier alleged threats and physical abuse. And at oral argument, the government suggested that a jury could accept the following:

> Armenta could believe he was under attack, bullets are flying, he needs to tell his friend, 'Shoot the truck; shoot the truck.' He says 'shoot the truck' in self-defense because he believes bullets are being fired around. Ward, at the same time, his belief based on everything he saw, is that he had no choice.

Oral Argument at 23:14–23:31. Although a jury could theoretically believe those two theories, those are *not* the defenses that were presented at trial. Armenta never claimed that he told Ward to shoot based on self-defense. Rather, through cross-examination, he implied that one of the victims misheard him. Further, Ward's duress

11

because to accept Ward's duress defense, a jury would necessarily believe that Armenta pointed a gun at Ward and told him to shoot Rich. Therefore, belief in Ward's defense "would tend to preclude the acquittal" of Armenta. *Peveto*, 881 F.2d at 857. However, the reverse is not necessarily true: finding Ward guilty of the assault on Rich would not "tend[] to establish the innocence" of Armenta. *Peveto*, 881 F.2d at 857. Rather, Armenta could still be guilty of assault based on pointing the gun at Rich or later hitting him with the gun. Similarly, finding Armenta guilty of assaulting Rich would not establish Ward's innocence. For instance, if Armenta was guilty of assault for initially pointing the gun at Rich, then Ward could still be guilty of assault for shooting at Rich (or for hitting Rich with a tire iron and pipe). Therefore, as to Rich, Armenta's and Ward's defenses were not entirely mutually antagonistic.

In contrast, Armenta's and Ward's defenses for the assaults on the two men in the boat—Chappell and Short—appear to be fully mutually antagonistic. Armenta said that Ward shot at these victims, while Ward said that Armenta shot at them. This is exactly the kind of "direct accusation that would have logically prevented the jury from accepting both theories." *Swingler*, 758 F.2d at 496. Either Armenta fired at the victims or Ward did, just as the defendant in *Peveto* either was an informant or not, and the defendant in *Pursley* either worked for the company identified on the tax

---

defense depended not only on Armenta's prior bad acts, but also on Armenta pointing a gun at him at the moment Ward shot at the truck.

return or did not. *See Peveto*, 881 F.2d at 858; *Pursley*, 474 F.3d at 765–66.

In sum, the defenses as to Rich appear to be only partially mutually antagonistic, but the defenses as to Chappell and Short appear to be fully mutually antagonistic. We therefore turn to the next *Pursley* prong.

## II.    Risk of Compromising Trial

"Mutually antagonistic defenses are not prejudicial per se." *Zafiro*, 506 U.S. at 539. Accordingly, to establish prejudice under the second step of *Pursley*, a defendant must demonstrate "a serious risk that a joint trial would compromise a specific trial right . . . or prevent the jury from making a reliable judgment about guilt or innocence." 474 F.3d at 765 (omission in original) (quoting *Zafiro*, 506 U.S. at 539). Severance is not warranted "merely because [defendants] may have a better chance of acquittal in separate trials." *Zafiro*, 506 U.S. at 540. But the risk of prejudice may be present where "evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant." *Id.* at 539. This risk is "increased when many defendants are tried together 'in a complex case and they have markedly different degrees of culpability.'" *United States v. Sarracino*, 340 F.3d 1148, 1165 (10th Cir. 2003) (quoting *Zafiro*, 506 U.S. at 539).

That said, we have held a defendant cannot make the requisite showing of prejudice just because evidence tied to a codefendant's defense has a "spillover" effect on him. *United States v. Zapata*, 546 F.3d 1179, 1191–92 (10th Cir. 2008). "Rather, a defendant must show that he was deprived of his right to a fair trial." *Id.* at

1191. So in *Zapata*, we held that the defendant failed to show prejudice from spillover evidence where the trial also included "clear and direct testimony at trial that specifically implicated [him] in the conspiracy." *Id.* at 1192. Relatedly, we have found no prejudice where spillover evidence does not directly relate to elements of the charged crime. *See Jones*, 530 F.3d at 1303. In *Jones*, two defendants were charged with bank fraud and conspiracy, and when one was arrested, she was found with marijuana and a gun, resulting in further charges against her. *Id.* at 1295–96. At trial, she elicited testimony about her codefendant's drug dealing to suggest that the marijuana belonged to him. *Id.* at 1302–03. Her codefendant argued that this evidence had a spillover effect, confusing the jury and "creating an unfavorable impression of him with jurors." *Id.* at 1301. But this court found no prejudice because no specific trial right was implicated, and the evidence of the codefendant's drug dealing did not help the government prove the elements of bank fraud and conspiracy. *Id.* at 1303.

Seeking to establish prejudice here, Armenta broadly argues that Ward's duress defense risked compromising his right to confront the witnesses against him and to receive due process and a fair trial. We do not agree. Although Armenta argues that Ward's testimony in support of his duress defense placed Armenta at the scene, implicated him in the attack of Rich, proved that Armenta fired a gun, and implied that Armenta shot at the boat, Armenta *himself* admitted to being at the scene, attacking Rich (albeit in self-defense), and firing his gun (albeit at the sky).

Moreover, even without Ward's testimony, the victims' "clear and direct

testimony at trial" expressly implicated Armenta. *Zapata*, 546 F.3d at 1192. In particular, the two men in the boat testified that Armenta shot at them, while Rich testified that Armenta pointed a gun at him and attacked him. This evidence would have been admitted had Armenta been tried separately, and Armenta did not meaningfully attempt to refute it. He presented no evidence in support of his theory that he shot into the air and that he only hit Rich in self-defense. These facts are reminiscent of *Pursley*, where we found mutually antagonistic defenses but no prejudice because the defendant failed to present any evidence supporting his defense theory. *See* 474 F.3d at 766. Armenta's problem was "the lack of evidence to support his theory of defense, not his misfortune of" being tried jointly with Ward. *Id.*

Armenta also argues that prejudice exists because Ward introduced inflammatory character evidence related to his drug use, prior threats, and the burns he allegedly inflicted on his girlfriend that could not have been admitted in a separate trial against him alone. He further emphasizes that because Ward was not a prosecutor required to provide notice before presenting prior-bad-acts evidence, Armenta was unprepared to rebut it. At the outset, we do not agree that *none* of this evidence would have come in if Armenta was granted a separate trial. For instance, as the government points out, it could have sought to introduce Armenta's alleged drug use on the day of the assaults and his comments about harming others to establish his motive or intent. *See* Fed. R. Evid. 404(b)(2). But we need not decide whether this evidence would have been admitted in a separate trial to conclude that Armenta was not prejudiced by it. The spillover of evidence from Ward's defense

15

was primarily related to Armenta's prior drug use and threats, not the elements of the charged offenses. *See Jones*, 530 F.3d at 1303. Thus, Ward's duress evidence did not help the government prove its case against Armenta; the victims carried that burden. Under these circumstances, the jury was perfectly capable of reaching a reliable determination of innocence or guilt, and Armenta fails to show prejudice under the second step of *Pursley*.

### III.    Weighing Prejudice Against Judicial Economy

Armenta's failure to establish prejudice is sufficient to affirm the district court's denial of severance. *See Jones*, 530 F.3d at 1300. But we nevertheless briefly address the third step of *Pursley*, under which a district court "weigh[s] the prejudice to a particular defendant caused by joinder against the obviously important considerations of economy and expedition in judicial administration." 474 F.3d at 765 (alteration in original) (quoting *Peveto*, 881 F.2d at 857). Even if a defendant can demonstrate prejudice, this step of the analysis "leave[s] the tailoring of any relief to the trial court's discretion." *United States v. Hill*, 786 F.3d 1254, 1273 (10th Cir. 2015). For example, the Supreme Court has recognized that "limiting instructions[] often will suffice to cure any risk of prejudice." *Zafiro*, 506 U.S. at 539; *see also United States v. Small*, 423 F.3d 1164, 1182 (10th Cir. 2005) (noting that Supreme Court "has sanctioned" limiting instructions "as an alternative to the more drastic remedy of severance").

Here, assuming Armenta established prejudice of some kind, the other side of the balance nevertheless weighed strongly in favor of joinder. When the district court

16

denied Armenta's motions to sever during the trial, it cited efficiency and economy as reasons to proceed together. And that justification makes sense: both defendants were charged with the same assaults, including under a theory of aiding and abetting, resulting in substantial overlap between the witnesses and exhibits. *See United States v. Hall*, 473 F.3d 1295, 1302 (10th Cir. 2007) (recognizing "that a joint trial was in the interests of judicial economy because the exact same witnesses and exhibits" would be used in both trials). Moreover, given this strong interest in judicial economy, the district court was well within its discretion to cure any prejudice to Armenta by way of limiting instructions rather than severance.[7] *See Zafiro*, 506 U.S. at 539.

Armenta thus fails on the third prong of *Pursley*, as well.

### Conclusion

Although Armenta's and Ward's defenses appear to be mutually antagonistic as to Chappell and Short and at least partially mutually antagonistic as to Rich, Armenta fails to show any prejudice flowing from that conflict, let alone any prejudice outweighing the interest in judicial efficiency or requiring severance rather than simple limiting instructions. Therefore, the trial court did not abuse its

---

[7] Recall that the district court told the jury that the detective's testimony about Armenta's drug use and threats could be considered not for its truth but only for the purpose of understanding the investigation. And before deliberations, the district court instructed the jury that evidence admitted for a limited purpose could not be used "for any other purpose or against any party not specifically mentioned." R. vol. 1, 600.

discretion in denying his request for severance. We affirm.

Entered for the Court

Nancy L. Moritz
Circuit Judge